ELAINE ZAPATHA & another[1] vs. DAIRY MART, INC.

Hampden. April 10, 1980. — August 5, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Contract*, Franchise agreement, Termination. *Uniform Commercial Code*, Sale of goods, Unconscionability, Good Faith. *Consumer Protection Act*, Franchise agreement. *Words*, "Good faith."

The principles of unconscionability and good faith expressed in art. 2 of the Uniform Commercial Code were applicable by analogy to a franchise agreement in which the sale of goods was a minor aspect of the entire relationship created by the agreement. [289-291]

A termination clause of a franchise agreement, authorizing the franchisor to terminate the agreement without cause on ninety days' notice, was not, in the circumstances, unconscionable by the standards expressed in G. L. c. 106, § 2-302. [291-295]

In an action by franchisees seeking to enjoin the termination of a franchise agreement pursuant to a clause authorizing the franchisor to terminate the agreement without cause on ninety days' notice, neither evidence that there was no commercial purpose for the termination other than the franchisees' refusal to sign a new agreement which differed somewhat from the original agreement, nor evidence that the franchisor's introductory brochure misstated a franchisee's status as the owner of his own business was sufficient to warrant a finding that the franchisor breached his obligation of good faith in terminating the agreement by the standards expressed in G. L. c. 106, § 2-103(1)(b) [295-297]; nor was there any showing that the franchisor engaged in any unfair, deceptive, or bad faith conduct by the standards expressed in G. L. c. 93A [297-300].

CIVIL ACTION commenced in the Superior Court on March 31, 1978.

The case was heard by *Adams, J.*

The Supreme Judicial Court granted a request for direct appellate review.

[1] Bernard Zapatha, husband of Elaine.

*Joseph D. Rosenbloom* for the defendant.

*Edward J. Barry* for the plaintiffs.

WILKINS, J.   We are concerned here with the question whether Dairy Mart, Inc. (Dairy Mart), lawfully undertook to terminate a franchise agreement under which the Zapathas operated a Dairy Mart store on Wilbraham Road in Springfield.   The Zapathas brought this action seeking to enjoin the termination of the agreement, alleging that the contract provision purporting to authorize the termination of the franchise agreement without cause was unconscionable and that Dairy Mart's conduct was an unfair and deceptive act or practice in violation of G. L. c. 93A.   The judge ruled that Dairy Mart did not act in good faith, that the termination provision was unconscionable, and that Dairy Mart's termination of the agreement without cause was an unfair and deceptive act.   We granted Dairy Mart's application for direct appellate review of a judgment that stated that Dairy Mart could terminate the agreement only for good cause and that the attempted termination was null and void.[2]   We reverse the judgments.

Mr. Zapatha is a high school graduate who had attended college for one year and had also taken college evening courses in business administration and business law.   From 1952 to May, 1973, he was employed by a company engaged in the business of electroplating.   He rose through the ranks to foreman and then to the position of operations manager, at one time being in charge of all metal finishing in the plant with 150 people working under him.   In May, 1973, he was discharged and began looking for other opportunities, in particular a business of his own.   Several months later he met with a representative of Dairy Mart.   Dairy Mart operates a chain of franchised "convenience" stores.   The Dairy Mart representative told Mr. Zapatha that working

---

[2] Because, as we were advised at oral argument, the Zapathas continued to operate the store while the case was pending in the Superior Court, the damages awarded in a separate judgment under G. L. c. 93A appear to have been limited to costs and attorney's fees.

for Dairy Mart was being in business for one's self and that such a business was very stable and secure. Mr. Zapatha signed an application to be considered for a franchise. In addition, he was presented with a brochure entitled "Here's a Chance," which made certain representations concerning the status of a franchise holder.[3]

Dairy Mart approved Mr. Zapatha's application and offered him a store in Agawam. On November 8, 1973, a representative of Dairy Mart showed him a form of franchise agreement, entitled Limited Franchise and License Agreement, asked him to read it, and explained that his wife would have to sign the agreement as well.

Under the terms of the agreement, Dairy Mart would license the Zapathas to operate a Dairy Mart store, using the Dairy Mart trademark and associated insignia, and utilizing Dairy Mart's "confidential" merchandising methods. Dairy Mart would furnish the store and the equipment and would pay rent and gas and electric bills as well as certain other costs of doing business. In return Dairy Mart would receive a franchise fee, computed as a percentage of the store's gross sales. The Zapathas would have to pay for the starting inventory, and maintain a minimum stock of saleable merchandise thereafter. They were also responsible for wages of employees, related taxes, and any sales taxes. The termination provision, which is set forth in full in the margin,[4]

---

[3] It included the following statements: ". . . you'll have the opportunity to own and run your own business . . ."; "We want to be sure we're hooking up with the right person. A person who sees the opportunity in owning his own business . . . who requires the security that a multi-million dollar parent company can offer him . . . who has the good judgment and business sense to take advantage of the unique independence that Dairy Mart offers its franchisees . . . We're looking for a partner . . . who can take the tools we offer and build a life of security and comfort . . ."

[4] "(9) The term of this Limited Franchise and License Agreement shall be for a period of Twelve (12) months from date hereof, and shall continue uninterrupted thereafter. If DEALER desires to terminate after 12 months from date hereof, he shall do so by giving COMPANY a ninety (90) day written notice by Registered Mail of his intention to terminate. If COMPANY desires to terminate, it likewise shall give a ninety (90) day

allowed either party, after twelve months, to terminate the agreement without cause on ninety days' written notice. In the event of termination initiated by it without cause, Dairy Mart agreed to repurchase the saleable merchandise inventory at retail prices, less 20%.

The Dairy Mart representative read and explained the termination provision to Mr. Zapatha. Mr. Zapatha later testified that, while he understood every word in the provision, he had interpreted it to mean that Dairy Mart could terminate the agreement only for cause. The Dairy Mart representative advised Mr. Zapatha to take the agreement to an attorney and said, "I would prefer that you did." However, he also told Mr. Zapatha that the terms of the contract were not negotiable. The Zapathas signed the agreement without consulting an attorney. When the Zapathas took charge of the Agawam store, a representative of Dairy Mart worked with them to train them in Dairy Mart's methods of operation.

In 1974, another store became available on Wilbraham Road in Springfield, and the Zapathas elected to surrender the Agawam store. They executed a new franchise agreement, on an identical printed form, relating to the new location.

In November, 1977, Dairy Mart presented a new and more detailed form of "Independent Operator's Agreement" to the Zapathas for execution. Some of the terms were less favorable to the store operator than those of the earlier form of agreement.[5] Mr. Zapatha told representatives of Dairy

---

notice, except for the following reasons which shall not require any written notice and shall terminate the Franchise Immediately:

"(a) Failure to pay bills to suppliers for inventory or other products when due.

"(b) Failure to pay Franchise Fees to COMPANY.

"(c) Failure to pay city, state or federal taxes as said taxes shall become due and payable.

"(d) Breach of any condition of this Agreement."

[5] In his testimony, Mr. Zapatha said that he objected to a new provision under which Dairy Mart reserved the option to relocate an operator to a

Mart that he was content with the existing contract and had decided not to sign the new agreement. On January 20, 1978, Dairy Mart gave written notice to the Zapathas that their contract was being terminated effective in ninety days. The termination notice stated that Dairy Mart "remains available to enter into discussions with you with respect to entering into a new Independent Operator's Agreement; however, there is no assurance that Dairy Mart will enter into a new Agreement with you, or even if entered into, what terms such Agreement will contain." The notice also indicated that Dairy Mart was prepared to purchase the Zapathas' saleable inventory.

The judge found that Dairy Mart terminated the agreement solely because the Zapathas refused to sign the new agreement. He further found that, but for this one act, Dairy Mart did not behave in an unconscionable manner, in bad faith, or in disregard of its representations. There is no evidence that the Zapathas undertook to discuss a compromise of the differences that led to the notice of termination.

On these basic facts, the judge ruled that the franchise agreement was subject to the sales article of the Uniform Commercial Code (G. L. c. 106, art. 2) and, even if it were not, the principles of unconscionability and good faith expressed in that article applied to the franchise agreement by analogy. He further ruled that (1) the termination provision of the agreement was unconscionable because it authorized termination without cause, (2) the termination without cause violated Dairy Mart's obligation of good faith, and (3) the termination constituted "an unfair method of competition and unfair and deceptive act within the meaning of G. L. c. 93A, § 2."

_____

new location and to a requirement that the store be open from 7 A.M. to 11 P.M. every day. Previously the Zapathas' store had been open from 8 A.M. to 10 P.M.

There were other provisions, such as an obligation to pay future increases in the cost of heat and electricity, that were more burdensome to a franchisee. A few changes may have been to the advantage of the franchisee.

1. We consider first the question whether the franchise agreement involves a "transaction in goods" within the meaning of those words in art. 2 of the Uniform Commercial Code (G. L. c. 106, § 2-103, as appearing in St. 1957, c. 765, § 1), and that consequently the provisions of the sales articles of the Uniform Commercial Code govern the relationship between the parties. The Zapathas point specifically to the authority of a court to refuse to enforce "any clause of the contract" that the court finds "to have been unconscionable at the time it was made." G. L. c. 106, § 2-302, as appearing in St. 1957, c. 765, § 1.[6] They point additionally to the obligation of good faith in the performance and enforcement of a contract imposed by G. L. c. 106, § 1-203, and to the specialized definition of "good faith" in the sales article as meaning "in the case of a merchant . . . honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." G. L. c. 106, § 2-103(1) (b), as appearing in St. 1957, c. 765, § 1.[7]

We need not pause long over the question whether the franchise agreement and the relationship of the parties in-

---

[6] General Laws c. 106, § 2-302, as appearing in St. 1957, c. 765, § 1, reads as follows:

"§ 2-302. Unconscionable Contract or Clause

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

[7] Generally throughout the Uniform Commercial Code, "good faith" is defined to mean "honesty in fact in the conduct or transaction concerned." G. L. c. 106, § 1-201 (19). The definition of "good faith" in the sales article includes a higher standard of conduct by adding a requirement that "merchants" observe "reasonable commercial standards of fair dealing in the trade." G. L. c. 106, § 2-103 (1) (b). There is no doubt that Dairy Mart is a "merchant" as defined under the sales article. See G. L. c. 106, § 2-104.

volved a transaction in goods. Certainly, the agreement required the plaintiffs to purchase goods from Dairy Mart. "Goods" for the purpose of the sales article means generally "all things . . . which are movable." G. L. c. 106, § 2-105 (1), as appearing in St. 1957, c. 765, § 1. However, the franchise agreement dealt with many subjects unrelated to the sale of goods by Dairy Mart.[8] About 70% of the goods the plaintiffs sold were not purchased from Dairy Mart. Dairy Mart's profit was intended to come from the franchise fee and not from the sale of items to its franchisees. Thus, the sale of goods by Dairy Mart to the Zapathas was, in a commercial sense, a minor aspect of the entire relationship.[9] We would be disinclined to import automatically all the provisions of the sales article into a relationship involving a variety of subjects other than the sale of goods, merely because the contract dealt in part with the sale of goods. Similarly, we would not be inclined to apply the sales article

---

[8] Where agreements have involved "goods," as defined in the Code, as well as other property or services, courts have attempted to ascertain whether the sale of goods was "their predominant factor, their thrust, their purpose, reasonably stated" (*Bonebrake* v. *Cox*, 499 F.2d 951, 960 [8th Cir. 1974]), and, if so, to apply the Code to the agreements. See *Pittsburgh-Des Moines Steel Co.* v. *Brookhaven Manor Water Co.*, 532 F.2d 572, 580 (7th Cir. 1976); *De Filippo* v. *Ford Motor Co.*, 516 F.2d 1313, 1323 (3d Cir.), cert. denied, 423 U.S. 912 (1975) (not primarily the sale of goods); *Bonebrake* v. *Cox, supra* at 960; *Lincoln Pulp & Paper Co.* v. *Dravo Corp.*, 436 F. Supp. 262, 275 (D. Me. 1977) (predominantly a service contract); *Ranger Constr. Co.* v. *Dixie Floor Co.*, 433 F. Supp. 442, 444-445 (D.S.C. 1977); *Burton* v. *Artery Co.*, 279 Md. 94, 102-115 (1977).

Accordingly, courts have applied the Uniform Commercial Code to distributorship agreements even though such agreements have concerned more than the sale of goods. See, e.g., *Corenswet, Inc.* v. *Amana Refrigeration, Inc.*, 594 F.2d 129, 134 (5th Cir.), cert. denied, 444 U.S. 938 (1979).

[9] The essential thrust of the transaction was an exchange of intangible rights, obligations and services. Viewed in a realistic economic light, the franchise agreement contemplated the licensing by Dairy Mart of an entire "business format," including a trademark, a system of doing business, and the right to occupy a fully equipped store, in return for which it was to receive a franchise fee and the expectation that the Zapathas' efforts, in keeping with their obligations under the agreement, would enhance the goodwill of the Dairy Mart franchise chain as a whole.

only to aspects of the agreement that concerned goods. Different principles of law might then govern separate portions of the same agreement with possibly inconsistent and unsatisfactory consequences.

We view the legislative statements of policy concerning good faith and unconscionability as fairly applicable to all aspects of the franchise agreement, not by subjecting the franchise relationship to the provisions of the sales article but rather by applying the stated principles by analogy. See *Commonwealth* v. *DeCotis,* 366 Mass. 234, 242 (1974), quoted in note 12, *infra.* This basic common law approach, applied to statutory statements of policy, permits a selective application of those principles expressed in a statute that reasonably should govern situations to which the statute does not apply explicitly. See Note, Article Two of the Uniform Commercial Code and Franchise Distribution Agreements, 1969 Duke L.J. 959, 980-985.

2. We consider first the plaintiffs' argument that the termination clause of the franchise agreement, authorizing Dairy Mart to terminate the agreement without cause, on ninety days' notice, was unconscionable by the standards expressed in G. L. c. 106, § 2-302.[10] The same standards are set forth in Restatement (Second) of Contracts § 234 (Tent. Drafts Nos. 1-7, 1973). The issue is one of law for the court, and the test is to be made as of the time the contract was made. G. L. c. 106, § 2-302 (1), and Comment 3 of the Official Comments. See *W.L. May Co.* v. *Philco-Ford Corp.,* 273 Or. 701, 707 (1975). In measuring the unconscionability of the termination provision, the fact that the law imposes an obligation of good faith on Dairy Mart in its performance under the agreement should be weighed. See *W.L. May Co.* v. *Philco-Ford Corp., supra* at 709.

The official comment to § 2-302 states that "[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or

---

[10] The agreement permitted immediate termination on the occurrence of certain conditions which are not involved in this case.

case, the clauses involved are so one-sided as to be uncon-
scionable under the circumstances existing at the time of the
making of the contract. . . . The principle is one of
prevention of oppression and unfair surprise . . . and not of
disturbance of allocation of risks because of superior bar-
gaining power." Official Comment 1 to U.C.C. § 2-302.[11]
Unconscionability is not defined in the Code, nor do the
views expressed in the official comment provide a precise
definition. The annotation prepared by the Massachusetts
Advisory Committee on the Code states that "[t]he section
appears to be intended to carry equity practice into the sales
field." See 1 R. Anderson, Uniform Commercial Code
§ 2-302:7 (1970) to the same effect. This court has not had
occasion to consider in any detail the meaning of the word
"unconscionable" in § 2-302.[12] Because there is no clear,
all-purpose definition of "unconscionable," nor could there

[11] The comment has been criticized as useless and at best ambiguous
(J. White & R. Summers, The Uniform Commercial Code 116 [1972]),
and § 2-302 has been characterized as devoid of any specific content
(Leff, Unconscionability and the Code — The Emperor's New Clause,
115 U. Pa. L. Rev. 485, 487-489 [1967]). On the other hand, it has been
said that the strength of the unconscionability concept is its abstraction,
permitting judicial creativity. See Ellinghaus, In Defense of Unconscion-
ability, 78 Yale L.J. 757 (1969).

[12] In *Lechmere Tire & Sales Co.* v. *Burwick,* 360 Mass. 718 (1972), we
considered a credit card application that purported to place on the
customer the risk of loss arising from the improper use of a lost card if the
holder had not given written notice of the loss to the seller. We said the
contract was an "adhesion" contract to be construed strictly against the
seller but that the agreement was not so unconscionable as to be unen-
forceable. *Id.* at 720-721. We noted that "[t]here is every reason of
public policy for protecting customers from contractual provisions, not
brought home to them, which are or may be unconscionable. . . . Com-
pare the policy expressed in G. L. c. 106, § 2-302." *Id.* at 721 n.3.

*Commonwealth* v. *DeCotis,* 366 Mass. 234 (1974), involved the ques-
tion whether a landowner's imposition on mobile home owners of resale
charges for which the landlord rendered no services was an unfair act or
practice under G. L. c. 93A. We said that "[t]hat provision of the Uni-
form Commercial Code which permits a court to refuse to enforce a con-
tract or a contract provision which is unconscionable provides a reason-
able analogy here. See G. L. c. 106, § 2-302." *Id.* at 242. We concluded
that the absence of consideration for the charge and the uneven bargain-
ing position of the parties made the practice unfair under G. L. c. 93A.

be, unconscionability must be determined on a case by case basis (see *Commonwealth* v. *Gustafsson*, 370 Mass. 181, 187 [1976]), giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party.

We start with a recognition that the Uniform Commercial Code itself implies that a contract provision allowing termination without cause is not per se unconscionable. See *Corenswet, Inc.* v. *Amana Refrigeration, Inc.*, 594 F.2d 129, 138 (5th Cir. 1979) ("We seriously doubt, however, that public policy frowns on any and all contract clauses permitting termination without cause"); *Division of Triple T Serv., Inc.* v. *Mobil Oil Corp.*, 60 Misc. 2d 720, 730 (Sup.Ct. 1969), aff'd 34 App. Div. 2d 618 (N.Y. 1970). Section 2-309 (3) provides that "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable." G. L. c. 106, § 2-309, as appearing in St. 1957, c. 765, § 1. This language implies that termination of a sales contract without agreed "cause" is authorized by the Code, provided reasonable notice is given. See *Rockwell Eng'r Co.* v. *Automatic Timing & Controls Co.*, 559 F.2d 460, 463 (7th Cir. 1977); *Aaron E. Levine & Co.* v. *Calkraft Paper Co.*, 429 F. Supp. 1039, 1049-1050 (E.D. Mich. 1976); *Artman* v. *International Harvester Co.*, 355 F. Supp. 482, 490 (W.D. Pa. 1973); *Weilersbacher* v. *Pittsburgh Brewing Co.*, 421 Pa. 118, 121 (1966). There is no suggestion that the ninety days' notice provided in the Dairy Mart franchise agreement was unreasonable.

We find no potential for unfair surprise to the Zapathas in the provision allowing termination without cause. We view the question of unfair surprise as focused on the circumstances under which the agreement was entered into.[13]

---

[13] As we shall note subsequently, the concept of oppression deals with the substantive unfairness of the contract term. This two-part test for unconscionability involves determining whether there was "an absence of

The termination provision was neither obscurely worded, nor buried in fine print in the contract. Contrast *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965). The provision was specifically pointed out to Mr. Zapatha before it was signed; Mr. Zapatha testified that he thought the provision was "straightforward," and he declined the opportunity to take the agreement to a lawyer for advice. The Zapathas had ample opportunity to consider the agreement before they signed it.[14] Significantly, the subject of loss of employment was paramount in Mr. Zapatha's mind. He testified that he had held responsible jobs in one company from 1952 to 1973, that he had lost his employment, and that he "was looking for something that had a certain amount of security; something that was stable and something I could call my own." We conclude that a person of Mr. Zapatha's business experience and education should not have been surprised by the termination provision and, if in fact he was, there was no element of unfairness in the inclusion of that provision in the agreement. See *Fleischmann Distilling Corp.* v. *Distillers Co.*, 395 F. Supp. 221, 233 ("It is the exceptional commercial setting where a claim of unconscionability will be allowed"). Contrast *Johnson* v. *Mobil Oil Corp.*, 415 F. Supp. 264, 268-269 (E.D. Mich. 1976) (illiterate service station operator incapable of reading dealer contract).

We further conclude that there was no oppression in the inclusion of a termination clause in the franchise agree-

meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams* v. *Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965). See *Corenswet, Inc.* v. *Amana Refrigeration, Inc.*, 594 F.2d 129, 139 (5th Cir. 1979). The inquiry involves a search for components of "procedural" and "substantive" unconscionability. See generally Leff, Unconscionability and the Code — The Emperor's New Clause, 115 Pa. L. Rev. 485 (1967). See also *Johnson* v. *Mobil Oil Corp.*, 415 F. Supp. 264, 268 (E.D. Mich. 1976); *Fleischmann Distilling Corp.* v. *Distillers Co.*, 395 F. Supp. 221, 232-233 (S.D.N.Y. 1975).

[14] This is true as to the initial agreement for the Agawam store and obviously true as to the subsequent identical agreement for the Springfield store.

ment. We view the question of oppression as directed to the substantive fairness to the parties of permitting the termination provisions to operate as written. The Zapathas took over a going business on premises provided by Dairy Mart, using equipment furnished by Dairy Mart. As an investment, the Zapathas had only to purchase the inventory of goods to be sold but, as Dairy Mart concedes, on termination by it without cause Dairy Mart was obliged to repurchase all the Zapathas' saleable merchandise inventory, including items not purchased from Dairy Mart, at 80% of its retail value. There was no potential for forfeiture or loss of investment. There is no question here of a need for a reasonable time to recoup the franchisees' initial investment. See *McGinnis Piano & Organ Co.* v. *Yamaha Int'l Corp.*, 480 F.2d 474, 480 (8th Cir. 1973); Gellhorn, Limitations on Contract Termination Rights — Franchise Cancellations, 1967 Duke L.J. 465, 479-481. The Zapathas were entitled to their net profits through the entire term of the agreement. They failed to sustain their burden of showing that the agreement allocated the risks and benefits connected with termination in an unreasonably disproportionate way and that the termination provision was not reasonably related to legitimate commercial needs of Dairy Mart. See Gellhorn, *supra* at 512. See also *Central Ohio Co-op Milk Producers, Inc.* v. *Rowland,* 58 Ohio Op. 2d 421, 423 (1972); *W.L. May Co.* v. *Philco-Ford Corp.,* 273 Or. 701, 708 (1975). To find the termination clause oppressive merely because it did not require cause for termination would be to establish an unwarranted barrier to the use of termination at will clauses in contracts in this Commonwealth, where each party received the anticipated and bargained for consideration during the full term of the agreement.

3. We see no basis on the record for concluding that Dairy Mart did not act in good faith, as that term is defined in the sales article ("honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade"). G. L. c. 106, § 2-103 (1) (*b*). There was no evidence that Dairy Mart failed to observe reasonable commer-

cial standards of fair dealing in the trade in terminating the agreement. If there were such standards, there was no evidence of what they were.

The question then is whether there was evidence warranting a finding that Dairy Mart was not honest "in fact." The judge concluded that the absence of any commercial purpose for the termination other than the Zapathas' refusal to sign a new franchise agreement violated Dairy Mart's obligation of good faith. Dairy Mart's right to terminate was clear, and it exercised that right for a reason it openly disclosed. The sole test of "honesty in fact" is whether the person was honest. See *Industrial Nat'l Bank* v. *Leo's Used Car Exch. Inc.*, 362 Mass. 797, 801 (1973). We think that, whether or not termination according to the terms of the franchise agreement may have been arbitrary, it was not dishonest.[15]

The judge concluded that bad faith was also manifested by Dairy Mart's introductory brochure, which made representations of "security, comfort, and independence." Although this brochure and Mr. Zapatha's mistaken understanding that Dairy Mart could terminate the agreement only for cause could not be relied on to vary the clear terms of the agreement, the introductory brochure is relevant to the question of good faith. However, although the brochure misstated a franchisee's status as the owner of his own business, it shows no lack of honesty in fact relating to the right of Dairy Mart to terminate the agreement. Furthermore, by the time the Zapathas executed the second agreement, and even the first agreement, they knew that they would operate the franchise, but that they would not own the assets used in the business (except the goods to be sold); that the franchise agreement could be terminated by them and, at least in some circumstances, by Dairy Mart;

---

[15] Under G. L. c. 106, § 1-203, "[e]very contract . . . imposes an obligation of good faith *in its performance or enforcement*" (emphasis supplied). We shall assume that an act of termination falls within the "performance" of the agreement. See *Baker* v. *Ratzlaff*, 1 Kan. App.2d 285, 288 (1977). But see Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195, 252 (1968).

and that in fact the major investment of funds would be made by Dairy Mart. We conclude that the use of the brochure did not warrant a finding of an absence of "honesty in fact." See *Corenswet, Inc.* v. *Amana Refrigeration, Inc.,* 594 F.2d 129, 138 (5th Cir. 1979); *Mason* v. *Farmers Ins. Cos.,* 281 N.W.2d 344, 347 (Minn. 1979).[16]

4. Although what we have said disposes of arguments based on application by analogy of provisions of the sales article of the Uniform Commercial Code, there remains the question whether the judge's conclusions may be supported by some general principle of law. The provisions of the Uniform Commercial Code with which we have dealt by analogy in this opinion may not have sufficient breadth to provide protection from conduct that has produced an unfair and burdensome result, contrary to the spirit of the bargain, against which the law reasonably should provide protection. See Restatement (Second) of Contracts § 231 (Tent. Drafts Nos. 1-7 1973); 3A A. Corbin, Contracts § 654A (1980 Supp.).[17]

---

[16] It has been suggested that, despite the limited definition of good faith in the Code, in some contexts the general obligation of good faith in § 1-203 can be used to import an objective standard of "decency, fairness or reasonableness in performance or enforcement" into a contract to which it applies. Farnsworth, Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code, 30 U. Chi. L. Rev. 666, 668 (1963). Good faith in this sense can be regarded as an "excluder," barring varied forms of unreasonable conduct in different circumstances. See Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195, 196 (1968). Rather than stretch the Code definition of good faith beyond the plain meaning of the words used to define good faith, we prefer, as we are about to do, to analyze the question of fairness and reasonableness independently of the Code.

[17] The *unconscionability provision of G. L. c. 106, § 2-302, concerns* circumstances determined at the time of the making of the agreement and relates only to the unconscionability of a term or terms of the contract. The "good faith" obligation of G. L. c. 106, § 1-203, deals with "honesty in fact," a question of the state of mind of the merchant or of his adherence to whatever reasonable commercial standards there may be in his trade. A merchant's conduct might not be dishonest and might adhere to reasonable standards, if any, in his trade and thus might be in good faith under § 1-203, and yet be unfair and unreasonably burdensome.

The law of the Commonwealth recognizes that under some circumstances a party to a contract is not free to terminate it according to its terms. In *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 104-105 (1977), we held that where an employer terminated an at will employment contract in order to deprive its employee of a portion of a commission due to him, the employer acted in bad faith. There, the employer correctly argued that termination of the employee was expressly permitted by the contract, and that all amounts payable under the terms of the contract at the time of termination had been paid. We concluded, however, that the law imposed an obligation of good faith on the employer and that the employer violated that obligation in terminating the relationship in order to avoid the payment of amounts earned, but not yet payable. The Legislature has limited the right of certain franchisors to terminate franchise agreements without cause.[18] On the other hand, the Legislature has not adopted limitations on the right to terminate all franchise agreements in general, and

---

[18] See G. L. c. 93B, § 4 (3) (*e*), (4) concerning the cancellation or nonrenewal of a motor vehicle dealer's franchise and requiring good cause for manufacturer's or distributor's action; G. L. c. 93E, §§ 5, 5A, requiring cause for a supplier's termination or nonrenewal of a gasoline station dealer's agreement and imposing an obligation on the supplier to repurchase merchantable products sold to the dealer.

New Jersey has a Franchise Practices Act of general applicability that "prohibits a franchisor from terminating, cancelling or failing to renew a franchise without good cause which is defined as the failure by the franchisee to substantially comply with the requirements imposed on him by the franchise. N. J. S. A. 56:10-5." *Shell Oil Co.* v. *Marinello,* 63 N.J. 402, 409 (1973), cert. denied, 415 U.S. 920 (1974). Although the act applied only prospectively (N. J. S. A. 56:10-8), in the *Marinello* case the New Jersey Supreme Court applied the expressed public policy to bar termination of a service station operator's franchise in the absence of good cause, as so defined.

The special status of service station operators has prompted some courts to adopt common law rules requiring good cause for termination in spite of contract language that seemed to allow termination without cause. See *Arnott* v. *American Oil Co.*, 609 F.2d 873, 880-884 (8th Cir. 1979), cert. denied, 446 U.S. 918 (1980); *Atlantic Richfield Co.* v. *Razumic,* 480 Pa. 366 (1978); *Ashland Oil, Inc.* v. *Donahue,* 223 S.E.2d 433 (W. Va. 1976).

its failure to do so is understandable because of the varied nature of franchise arrangements, where such varying factors exist as the relative bargaining power of the parties, the extent of investment by franchisees, and the degree to which the franchisee's good will, as opposed to that of the franchisor, is involved in the business operation. Further, in recognition of a general duty of good faith and fair dealing in business transactions under the law of the Commonwealth, c. 93A of the General Laws imposes on any person who engages in the conduct of any trade or commerce an obligation not to use any "unfair or deceptive acts or practices," as defined in G. L. c. 93A, § 2 (a), as appearing in St. 1967, c. 813, § 1, in dealing with another person who engages in any trade or commerce. G. L. c. 93A, § 11, as amended through St. 1979, c. 72, § 2.

We thus analyze the case before us in terms of whether in terminating the agreement Dairy Mart failed to act in good faith in a broader sense than the term is used in G. L. c. 106, § 1-203, or dealt unfairly with the Zapathas, and whether Dairy Mart engaged in any unfair or deceptive act or practice. Much of what we said in discussing unconscionability and bad faith in terms of the Uniform Commercial Code applies here and need not be repeated. There is no showing that Dairy Mart usurped funds to which the Zapathas were reasonably entitled. Certainly Dairy Mart did not deprive the Zapathas of income that they had fairly earned, as the employer attempted to do in the *Fortune* case. We know nothing of any good will that the Zapathas had developed in their own name. There was no showing that, by their special efforts, the Zapathas built up the business at the Springfield store. As far as the record shows, they would lose no financial investment on termination and would not be left with unsaleable inventory or special purpose supplies and equipment. Chapter 93A, § 2 (b), instructs us to look to interpretations of the Federal Trade Commission Act in construing the meaning of the words "unfair or deceptive acts or practices" in G. L. c. 93A, § 2 (a). No case or Federal Trade Commission interpretation has been brought

to our attention making the termination at will of a franchise agreement of the character involved here an unfair or deceptive act or practice.[19]

We are most concerned, as was the judge below, with the introductory circular that Dairy Mart furnished Mr. Zapatha. The judge ruled that the introductory circular contained misleading information concerning the Zapathas' status as franchisees. However, we cannot find in that document any deception or unfairness that has a bearing on the right of Dairy Mart to terminate the agreement as it did. A representative read the termination clause to Mr. Zapatha before the Zapathas signed the agreement. Mr. Zapatha declined an invitation to take the agreement to a lawyer. He understood individually every word of the termination clause. Moreover, when Dairy Mart terminated the agreement, it offered to negotiate further, and the Zapathas did not take the opportunity to do so.

Unless we were to take the position that termination without cause of a franchise agreement of the character involved here is prohibited invariably by the law of the Commonwealth, a position we decline to adopt (cf. *Richey* v. *American Auto. Ass'n,* 380 Mass. 835 (1980)), Dairy Mart lawfully terminated the agreement because there was no showing that in terminating it Dairy Mart engaged in any unfair, deceptive, or bad faith conduct.

*Judgments reversed.*

---

[19] The Federal Trade Commission adopted a rule in December, 1978, effective July 21, 1979, requiring franchisors to make certain disclosures in a separate document furnished to prospective franchisees. Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 16 C.F.R. § 436. The Zapathas do not rely on this rule.