**In re STANDARD FINANCIAL MANAGEMENT CORP., d/b/a New England Rare Coin Galleries, Debtor.**

**Bankruptcy No. 87–10219–HL.**

United States Bankruptcy Court,
D. Massachusetts.

May 11, 1988.

---

Joseph F. Ryan, Brown, Rudnick Freed & Gesmer, Boston, Mass., for debtor.

Cyril Hochberg, Hochberg & Rossi, Boston, Mass., for Bank of New England.

## MEMORANDUM RE: CREDIT CARD CHARGEBACKS

HAROLD LAVIEN, Bankruptcy Judge.

The debtor, Standard Financial Management Company, d/b/a New England Rare Coin Galleries (NERCG) sold rare coins through its store as well as over the telephone. Payments for the rare coins were made by cash, check, credit cards or wire transfers. On February 13, 1987, the Federal District Court of Massachusetts, at a hearing on the complaint of the Federal Trade Commission, appointed Joseph Ryan special counsel to take possession of NERCG's assets and authorized him to file a Chapter 11, which he did on the same day and at the same time, substantially, closed down the business operation.

The Bank of New England (BNE) processed the credit card, VISA and Master Charge, transactions of NERCG pursuant to two contracts, one pertaining to VISA and one pertaining to Master Charge. The contracts were signed by representatives of NERCG and BNE on June 27, 1983 and renewed on March 21, 1985.

The BNE provided other financial services to NERCG, including a revolving loan, lease equipment financing, depository and checking. At the commencement of the case, February 13, 1986, the NERCG maintained a balance of $179,948.47 including $109,894.32 in a segregated payroll account. BNE turned over the funds to NERCG on February 26, 1987 pursuant to a written stipulation that provided BNE did not prejudice it's right to later assert any lien, pledge, right or interest against the $179,948.47.

In 1985, customers charged back 24 times, for a total of $22,546.24. In 1986, customers charged back 25 times, for a total of $35,095.00. In the first quarter of 1987, during which, on February 13th, NERCG closed and the Chapter 11 was filed, customers charged back 9 times, for a total of $7,390.00. Over the next two quarters of 1987 post-filing in the Chapter 11, customers sought to charge back 62 times, for a total of $114,743.00. The total post-petition charge backs over the first three quarters of 1987 was $115,168.00 representing 63 transactions. BNE seeks to recover $115,168.00 in post-petition chargebacks and an additional $5,100.06 in bank service fees from the $179,948.47 that NERCG had on deposit with BNE on the date the case was commenced.

While the evidence was skimpy, BNE has introduced unrebutted evidence that NERCG solicited the credit card sales through telemarketing over the telephone, that were later charged back. In the absence of contrary evidence, the Court so finds.

The Court has held two hearings, reviewed eight memoranda of close to 200 pages, plus copious attachments, not counting a further unconsidered memorandum submitted by special counsel beyond the briefing schedule. It would appear that each side is literally trying to convince the Court by the sheer weight of their arguments.

BNE's claims rest on the provisions of the VISA and Master Charge standard form agreements which, in turn, refer to the terms and conditions set forth in other documents including the respective Operating Rules. The bank's position is that the express terms of the contracts gives it a secured position[1] in the funds of the debtor

---

1. Visa Merchant Agreement, ¶ 3.4:
   1. Security Interest: Merchant hereby grants to Bank a security interest in any deposits or other sums at any time credited by or due from Bank to Merchant security for any and all obligations of Merchant to Bank arising out of the terms of this Agreement or otherwise, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising or acquired.

   Master Charge Merchant Agreement ¶ III(e):
   (e) Merchant hereby grants to Bank a security interest in any deposits, balance of deposits or other sums at any time credited by or due from Bank to Merchant as security for any and all obligations of Merchant to Bank

if, in fact, they are really funds of the debtor and not merely provisional credits subject to being cancelled until the expiration of the charge back period.[2]

■ Special Counsel would have the Court resolve the entire dispute by finding that BNE's signed credit card agreements' security interest to be unenforceable. It is claimed that if BNE can be a secured creditor for claims of credit card holders who should be unsecured, it would allow unsecured credit card holders to recover 100 cents on the dollar while cash or check-paying customers may recover nothing. To allow BNE a security interest, if one follows this line of reasoning, would result in an early and inequitable distribution of assets to unsecured creditors, an anathema in bankruptcy. *Official Committee of Equity Security Holders v. Mabey,* 832 F.2d 299 (4th Cir.1987).

Although in some cases that may be the ultimate result, it cannot alter a valid security agreement on which the secured party, in good faith, relied. The bank is entitled to be secured for any liabilities it may incur as a result of the agreements if it obtained the security interest properly prepetition and pre the preference period. From the express language of the contracts BNE was intended to have a secured position in any credits still held by the bank to cover any properly made chargeback claims unless some provision of the Uni-

form Commercial Code prevents the parties from so agreeing.

■ Special Counsel claims that BNE does not have a properly secured security interest. It is argued that since Article 9 of the Massachusetts U.C.C., does not apply to deposit accounts, BNE does not have a security interest. Mass.Gen.L. ch. 106 § 9–101 et. seq. BNE is properly secured. BNE correctly cites Article 4 of the Massachusetts U.C.C. as controlling the security interest of banks in deposit accounts. Mass.Gen.Laws ch. 106 § 4–101 et. seq. Credit card drafts are an item under Mass. Gen.Laws ch. 106 § 4–104(g):

> *Item* means any instrument for the payment of money even though it is not negotiable but does not include money.

*Item* is to be broadly defined *Houston Contracting Co. v. Chase Manhattan Bank, N.A.,* 539 F.Supp. 247, 33 U.C.C.Rep. 1730 (S.D.N.Y.1982). A credit slip is an instrument for payment.

A bank retains a security interest in an item once it has been deposited in an account even if the funds can be withdrawn:

> A bank has a security interest in an item and any accompanying documents or the proceeds of either ... (b) in case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given whether or not the credit is drawn upon and whether or not there is a right of chargeback.

arising out of the terms of this Agreement, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising or acquired.

2. VISA Merchant Agreement ¶ 3.3:
1. Chargebacks: VISA's Operating Regulations govern presentment of sales drafts by Bank and chargebacks of sales drafts by card-issuing banks to Bank, and Bank shall have the right to collect from Merchant or to charge back directly to Merchant or Merchant's account with Bank the full amount of any sales draft which is in violation of this Agreement, which Bank is unable to present pursuant to the Operating Regulations or which is rejected or charged back to Bank by NEBA or by a card-issuing bank pursuant to the Operating Regulations or any Instructions.
Master Charge Merchant Agreement ¶ III(b):
(b) If Merchant is a Multiple Location Merchant, it shall present each sales slip and

credit slip to Bank within the time period (not to exceed 30 calendar days) prescribed by NEBA for Merchant's class of Multiple Location Merchant. If Merchant is not a Multiple Location Merchant, it shall present each sales slip and credit slip to Bank within three (3) Bank business days following the Effective Date of the slip. Bank shall pay Merchant for sales slips not later than the next Bank business day following the day of deposit. Payment may be effected by cash, Bank check or credit to Merchant's account with Bank. All figures submitted by Merchant to Bank are subject to final checking and audit by Bank and Bank may debit or credit deficiencies or overages to Merchant's account with Bank. Bank may also debit Merchant's account for all amounts due Bank by reason of any charge-back, breach of warranty or other obligation of Merchant to Bank hereunder.

Mass.Gen.Laws ch. 106 § 4–208. There is no filing requirement. Mass.Gen.Laws ch. 106 § 9–203(1). The BNE security interest in the NERCG deposits is valid under the U.C.C.

■ Special Counsel seeks to have the Court find that the payments were not provisional because the BNE drafted contracts state that NERCG will receive payment the business day after NERCG submits a credit slip to BNE and do not explicitly provide that the credits are provisional and ambiguities should be construed against the drafting party. *King v. Prudential Insurance Company of America,* 359 Mass. 46, 267 N.E.2d 643 (1971). BNE claims that its right under the signed credit card agreements to automatically charge back from NERCG deposit accounts makes the settlements provisional. The Court finds both the language of the contracts and the conduct of the parties evidence an intent that the funds on deposit were property of the debtor subject to chargebacks. For the two years pre-petition, NERCG had use of the money the day after the credit slip was deposited and BNE charged back directly from the accounts. A bankruptcy court in Texas considered an identical situation and persuasively states:

The gross cash on hand in the accounts as of the petition date is a fund owed to Debtor by First City Bank. That fund or chose in action representing right to payment thereof is property of the estate in which Debtor has legal title, subject to defeasance by settlements. 11 U.S.C. § 541(a). This Court extends the decision further than the Opinion of the Court in Equitable Bank of Littleton. To allow parties who dealt with a debtor-in-possession, pre-petition, to continue subjectively crediting or off-setting these credit card settlements post-petition would defeat the definition of property of the estate and the policy of the automatic stay. In the opinion of this Court, the net effect of Article 4.212 of the Texas Uniform Commercial Code, absent bankruptcy, is that the funds remaining after all settlements of the Bank as to customer claims would be property of the depositor (now Debtor). The Bank-

ruptcy Code refers us to state law for the definition of property rights. *Butner v. United States,* 440 U.S. 48 [99 S.Ct. 914, 59 L.Ed.2d 136] (1979). As the Bank holds the funds subject to settlements, the Bank is bound by 11 U.S.C. § 362(a)(7) n1 and 11 U.S.C. § 553(a), and must seek Court approval to accomplish set-off. Although the account in issue is of a special nature under banking law, there was created a debtor-creditor relationship, wherein the bank is obligated to repay the depositor-creditor. *In re Williams, supra,* [61 B.R. 567 (Bankr.N.D.Tex.1986) ]. On the petition date, the Debtor "owed" the Bank the ultimate "settlement" funds which the Bank became obligated to pay; the Bank owed the Debtor the "net" funds after ultimate settlement.

n1 11 U.S.C. § 362(a)(7):

(a) Except as provided in subsection (b) of this section, a petition filed under § 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 USC. 78eee(a)–(3)), operates as a stay, applicable to all entitles, of—

*In re United Sciences of America,* 84 B.R. 79, 82 (Bankr.N.D.Texas 1988). The Court finds that NERCG had legal title to the deposit accounts, subject to defeasance by settlements.

Thus, since the bank has a right to recover any credits previously issued, it may be necessary to have a further hearing to trace credits from VISA and Master Charge in the non-payroll portion of money owed by the bank to the debtor if Special Counsel pursues his allegation that funds also came from other sources such as non-credit card sales; however, first the amount of any proper chargebacks must be determined.

■ BNE relies on provisions in the VISA Operating Rules and Master Charge Rules and Regulations while Special Counsel relies on the Truth in Lending Laws, to delineate when a customer may chargeback, 15 U.S.C. § 1601 *et seq. In re Twenty–Four Hour Nautilus Swim and Fitness*

*Center, Inc.,* 81 B.R. 71 (D.Colo.1987). The former allows the customer to cancel a charge in 120 to 180 days, while the latter requires a written report and has stricter provisions including 100 mile and 60–day limitation. BNE contends that the TILA does not apply since it is limited to the relationship between the card user and its issuing bank and not the merchant. Further, it is argued, the debtor in the contracts agreed to be bound by the Operating Rules. Finally, BNE states that Congress did not provide a maximum protection for the consumer but, rather, a minimum which the Operating Rules improve.

Special Counsel argues that the VISA Operating Rules and Master Charge Rules and Regulations cannot apply to NERCG because NERCG did not and could not, after trying, have known that it was obligated to provide these additional protections.

The *Twenty-Four Hour Nautilus Swim and Fitness Center, Inc.* decision is not applicable because of the unique circumstances of this case. The Master Charge agreement provides that credit card holders can charge back from a card accepting merchant pursuant to the "Operating Guide" given to merchants who use Master Charge or VISA. The VISA card agreement does state that chargebacks are governed by VISA Operating Regulations; however, BNE only gives the merchants the Operating Guide for guidance. Section 11 of the "Operating Guide", which governs chargebacks, only discusses chargebacks that result from the merchant's failure to properly submit credit slips. Significantly, no mention is made that consumers are entitled to chargeback, or the time or under which conditions this can be done or, for that matter, if anything other than the merchant's normal business practices governed. The end of Section 11 does tell the merchant to refer to Master Charge Rules and Regulations and VISA Operating Rules, available upon request, for further information on chargebacks. This is not enough to put the merchant on notice that chargebacks may be allowed for reasons other than technical flaws in the credit slip or the merchant's normal business practices.

NERCG did attempt to obtain further information on the basis of credit card transactions. Mr. Richard Fried, chief financial officer of NERCG, sometime in 1985 or early 1986, wanted to program NERCG computers to transact credit card sales and to keep track of daily balances. He wanted information respecting the NERCG—BNE credit card relationship. After failing to find the relevant documentation within NERCG, Mr. Fried spoke to various people in BNE and was told that no material was available. Finally, he convinced one bank employee, on the condition he return the materials directly to her, to send him some dog eared papers. There is no evidence of exactly what those papers contained and Mr. Fried testified that they were of minimal assistance. In fact, when produced as evidence, the thick volume of the VISA Operating Rules had a caption in it's front cover that states:

> NOTICE: · The information furnished herein by Visa is CONFIDENTIAL and is distributed to Visa Members for their exclusive use in operating their Visa sponsored programs, and shall not be duplicated, published or disclosed in whole or in part without the prior written permission of Visa.

Only banks and related entities can be members of VISA.[3] Alfred M. Tringali, an assistant vice president of BNE who supervised the provision of credit card services to NERCG, stated that the BNE does not let merchants look at the VISA Operating Rules because it contains confidential information that could be used to forge credit cards. BNE seeks to obligate merchants to regulations that it gives no notice of, does not supply upon request, and pursues a specific policy to keep the regulations confidential. In fact, the direct testimony of Mr. Tringali. was that the information the merchant needed to understand the basis of chargebacks was summarized in the guide which, as previously indicated, had no information on customer chargebacks.

3. VISA USA BY–LAWS Article II (1986).

No one testified on behalf of the bank that the charge back processes were explained orally to debtor.

To find a contract provision invalid because it is unconscionable "... involves determining whether there was an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Zapatha v. Dairy Mart, Inc.,* 381 Mass. 284, 293, fn. 13, 408 N.E.2d 1370 (1980), *citing Williams v. Walker Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir 1965). BNE's failure to give any notice of the chargeback policy deprived NERCG of any choice and the expansion of BNE security interests undeniably favors BNE and created hidden and potentially serious liability to the debtor, especially when reference is simply included in this pre-printed standard form multi-paragraph contract. There was nothing in the previous minimal chargebacks of the debtor to alert it to the undisclosed charge back provision; there was no meeting of the minds on those terms which can control the relationship of the parties. Incidentally, there was no evidence offered by the bank that these charge back terms were even brought to the attention of credit card holders.

█ BNE, nonetheless, claims the debtor should be held liable because NERCG breached its duty of good faith. *Rand–Whitney Packaging Corp. v. Robertson Group,* 651 F.Supp. 520 (D.Mass.1986). BNE makes the allegation, with exhibits not admitted in the trial, that NERCG fraudulently used credit cards, which is a criminal offense. 15 U.S.C. § 1644. In addition, BNE states that NERCG submitted its credit slips later than the seven days provided under TILA. 15 U.S.C. § 1666e; 12 C.F.R. § 226.12(e). On the basis of these assertions, BNE would have the Court find NERCG has unclean hands and cannot contest the BNE right to collect. There is no need for the Court to abrogate all of the debtor's rights for BNE

to be made whole. BNE can recover the amounts that NERCG fraudulently charged pursuant to its security interest as a valid chargeback and may even have a criminal remedy under 15 U.S.C. § 1644. The failure of NERCG to timely deposit the return slips has no real importance. BNE suffered no harm because of the delay. The slips were submitted in early February. The first post petition chargeback did not occur until March. BNE had full notice of returns when consumers charged back post petition. Furthermore, the Court has determined that the bank is entitled to charge back regardless of the issuance of credit memos, so that no harm is suffered by the bank.

Since there was no consensual agreement between the card holder, the banks, and the merchant in this case, the right of the merchant's bank to chargeback against the merchant for some claim initiated by the card holder must be based on some other controlling law other than the unrevealed VISA and Master Charge Regulations. In this case, Congress has addressed the problem in the TILA.

While it is not explicit that the TILA applies to the merchant who is not the traditional consumer, the application between the card holder and the issuing bank of necessity sets of a train of events.[4] If the card holder has a right to charge back against the issuing bank, then that bank has a right against the merchant's bank who has a right against the merchant. It follows that conversely if the card holder has no right for a chargeback against the issuing bank, there is nothing to charge back against the merchant's bank or the merchant.

TILA grants eligible credit card holders the right to chargeback purchases if the holder (1) objects in writing to the charge, 15 U.S.C. § 1666; (2) the holder objects within 60 days of receiving the statement listing the charge, 15 U.S.C. § 1666i; (3) initial transaction took place within 100

---

**4.** TILA, itself, does reach and directly regulate at least part of the relationship between the merchant and the merchant's bank. The merchant is required to submit credit statements for forgiveness of credit card debt within seven days of the credit being allowed. 15 U.S.C. § 1666(e); 12 C.F.R. § 226.12(e).

miles or the same state as the customer, 15 U.S.C. § 1666i, or (4) the use of the credit card was unauthorized, 15 U.S.C. § 1643. The credit card customer cannot recover amounts already paid, 15 U.S.C. § 1666i(b). The credit card holder who complies with the requirements of TILA can chargeback a purchase if the credit card holder can present a bona fide defense to payment.[5] 15 U.S.C. § 1666i; *Izraelewitz v. Manufacturers Hanover Trust Co.*, 120 Misc.2d 125, 465 N.Y.S.2d 486 (1983).

The claimed chargebacks fall into several categories which provide a convenient format for analysis. First, the merchant is not liable for a chargeback unless the card holder files a written objection, 15 U.S.C. § 1666(a); *Himelfarb v. American Express Company*, 301 Md. 698, 484 A.2d 1013 (1984); *Contra Lincoln First Bank v. Carlson*, 103 Misc.2d 467, 426 N.Y.S.2d 433 (1980). Companies in bankruptcy especially need written objections to be able to review the basis of chargebacks. Chargebacks which are questionable may be borne by companies outside of bankruptcy as a cost of business, but they cannot automatically be allowed in bankruptcy because they deplete the estate from which honest creditors will receive a pro rata share and frustrate the equitable distribution of assets to all creditors which is the essence of the bankruptcy process. Credit card holders failed to give written notice of $19,615 of the chargebacks.

Second, the customer cannot recover if he lives more than 100 miles or a different state from the address that the initial transaction took place. 15 U.S.C. § 1666i(b)(3). "The question of where a transaction occurs (as in case of mail or telephone orders, for example) is to be determined by state or other applicable law." *Izraelewitz v. Manufacturers Hanover Trust Company*, 120 Misc.2d 125, 465 N.Y.

S.2d 486 (1983), *citing, Federal Reserve Board Official Staff Commentary* on 12 C.F.R. § 226.12(c)(3)(iii), 12 C.F.R. § 266 Supplement I (1988).[6]

Special Counsel argues that the NERCG mailing an acknowledgement to credit card customers is the last material act of the contract and so the transaction should be considered taking place in Boston and cites, in support, *Roto–Lith Ltd. v. F.O. Bartlett & Co.* 297 F.2d 497 (1st Cir.1962). This case is not applicable since it involves the question of which form should prevail when the buyer and seller have exchanged many forms.

BNE argues that the transaction should be considered to take place in the customer's house. In answer to BNE's counsel, the representatives of the debtor said that orders for coins were solicited by telemarketing which, of course, means the debtor's sales personnel offered to sell coins to customers contacted by telephone who accepted the offer by providing their charge card information. Special Counsel offered no evidence that the orders subject to chargebacks were obtained in any different manner. While there is no Massachusetts case on point, the overwhelming majority of cases considering this issue have found that when a contact is made on the telephone, the transaction takes place where the person utters his acceptance.[7]

Courts in New York have twice considered the question of under what conditions the geographic limitations apply. In its first decision, the state court found that if the card issuer violated TILA, then the credit card holder can assert that violation of TILA to refuse to pay even if the card holder lives more than 100 miles or lives in another state from the initial transaction. *Lincoln First Bank v. Carlson*, 103 Misc. 2d 467, 426 N.Y.S.2d 433 (1980).

---

**5.** Special Counsel concedes that a requirement that claims exceed $50 and that an initial effort be made to resolve the dispute with the merchant, 15 U.S.C. 1666i are not in issue.

**6.** The Federal Reserve Board has promulgated Resolution Z, 12 C.F.R. § 226 et. seq., to implement TILA. Staff interpretation of Regulation Z is entitled to great weight unless demonstrably irrational. 16 U.S.C. § 1604; *Ford Motor*

*Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980).

**7.** 1 *Corbin Contracts* § 78 (1965) (and cases cited herein). *Lockwood Corporation v. Black*, 501 F.Supp. 261 (S.D.Tex.1980), *aff'd*, 669 F.2d 324 (5th Cir.1982) (The court interpreted Texas law); *Travelers Insurance Company v. Workmen's Compensation Appeals Board*, 68 Cal.2d 7, 64 Cal.Rptr. 440, 445, 434 P.2d 992, 997 (1967).

In its second decision, the Court found that geographic limitations precluded a credit card customer in New York disputing a telephone order he made to a merchant in Hawaii, *Izraelewitz v. Manufacturers Hanover Trust Company*, 120 Misc.2d 125, 465 N.Y.S.2d 486 (1983). The case is not applicable for two reasons. The court did not consider the legal significance of a telephone order. More importantly, in *Izraelewitz*, the merchant uttered his acceptance of the offer in Hawaii while the credit card customer, in this case, uttered his acceptance of the offer in the comfort of his own home.

Social policy favors finding that the transaction took place in the customer's home. TILA, it is true, intended to limit the liability of merchants to far away customers who might fraudulently chargeback a purchase, secure in the knowledge that the company will not sue because the sum is usually too minor. In this case, however, the seller came into the customer's house by calling the customer. The seller, by soliciting the sale in distant regions, implicitly states that doing business in those areas is not too minor for the seller to take whatever action it needs to protect its rights. Conversely, the customer who is solicited at home has a reasonable expectation that future contacts can likewise be adjusted at or near his home. The Court finds the transaction took place at the customer's home and, therefore, does not find under the facts of this case that the 100 mile limitation applies.

■ Third, TILA limits the amount of the possible chargeback to the amount of the bill not yet paid. 15 U.S.C. § 166i(b). This provision makes TILA compatible with equity and the bankruptcy process. On one hand, the estate retains any assets, such as payment, it has as of the date the case was commenced. On the other hand, the customer is not made to pay the remainder of the outstanding amount, post-petition, on the contract unless the seller fully performs. As for the failed performance, the buyer has a claim. This result is both equitable and comports with bankruptcy's goal of treating all creditors of the same class equally. A customer who paid for a coin, pre-filing, and then had a dispute with the merchant, post-filing, would not be able to recover 100 cents on the dollar but would simply have an unsecured claim against the bankruptcy estate. This is different from the unpaid credit card bill because of the still conditional nature of the credit, both between the card holder, the issuing bank, and the merchant and its bank. At any rate, this distinction was considered important by Congress and is made explicit in the TILA, 15 U.S.C. § 1666i(b). Thus, the $4,100 of these chargebacks of already paid charges are not allowed. They are in addition to and not included within the excluded chargebacks over 60 days.

■ Fourth, the credit card consumer is limited to 60 days from after he receives a bill to charge back a purchase, 15 U.S.C. § 1666i; *Pinner v. Schmidt*, 805 F.2d 1258, 1264 (8th Cir.1986); *Gray v. American Express Company*, 743 F.2d 10, 14 (D.C.Cir. 1984). It is agreed that chargebacks for $52,240 were more than 60 days after the receipt of their bills and, therefore, are improper chargebacks.[8]

■ Fifth, chargebacks for unauthorized use of credit cards are clearly appropriate.

■ Sixth, Special Counsel makes a contention that the bank cannot charge back where the debtor had previously issued a credit to the customer. That sounds appealing on the surface but does not fly. The issuing bank would have to credit the card holder and then seek reimbursement from the merchant bank who, in turn, would charge back the merchant. That right is no more effected by bankruptcy than any other TILA claim made post-filing by the card holder against the issuing bank when the merchant's bank has both a security interest in undisbursed credits and a charge back right. The bank may need to secure relief from automatic stay to exercise its right but its ultimate right is not diminished.

**8.** The Court notes that all people who charged back orally, did so 60 days after receipt of the bill so that $19,615 is within this figure. While some of those who already paid and those who unilaterally returned coins are also subsumed, the finding deals only with those not included.

BNE claims it can charge back for coins returned both pre and post-petition. Nothing in TILA or in the agreement between the bank and merchant authorizes a credit card holder to unilaterally return merchandise and obtain a chargeback. That transaction is controlled by the merchant's own policy. The buyer where, here, the merchant does not recognize a right of return, simply has an unsecured claim. *Izraelewitz v. Manufacturers Hanover Trust Company*, 120 Misc.2d 125, 465 N.Y.S.2d 486 (1983). A chargeback for returns of $4,975.00, the amount not subsumed, is not appropriate.

Thus, BNE charged back $63,315 which represents the net total of chargebacks from people who either charged back after paying the bill, or those who claimed a chargeback after 60 days of the receipt of the bill, or those who unilaterally sought to return coins. The appropriate chargeback would be $115,168 less $63,315 or $51,853 plus bank fees of $5,070.06, a total of $56,923.06.

Before the bank can seek payment of that amount, the Court must determine how much of the $179,948.47 is properly attributed to the segregated payroll account. This calculation may be unnecessary since even if the maximum amount, namely, the amount in the payroll account, were deducted from the credit standing in debtor's bank account ($179,948.47 less $109,894.32) the $70,054.15 would be sufficient to satisfy the bank's secured interest and its right to adjust the provisional credit. However, since Special Counsel alleges a potential tracing problem because part of that credit may not be attributable to credit card receipts but, rather, other receipts, a brief further analysis of the payroll account is in order.

Special Counsel has provided the Court with the information that NERCG owed it's employees $80,373.41 on the date the case was commenced. Payroll accounts are free of security interests to the amount sufficient to meet short term payroll needs. *In re Saugus General Hospital Incorporated*, 698 F.2d 42 (1st Cir.1983).

NERCG paid its employees in three ways—salaries, commissions, and al-lowing employees to cash in vacation days. Both parties agree that the $42,620.41 in commissions is subject to offset for the chargebacks. It is also agreed that commissions for salesmen and supervisors averaged 15%. The Court has found that the bank could have charged back $51,853.00, thereby reducing the amount free of BNE security interest by $7,777.95. The amount of the payroll account that is free of BNE interest is $80,373.41 less $7,777.95, or $72,595.46. Therefore, the amount available to the bank, short of a tracing problem, is $179,448.47 less $72,595.46 or $106,853.01, again more than enough to provide for payment to BNE of its chargeback of $56,923.06, to which it is entitled under TILA. 15 U.S.C. § 1601 et. seq.

Unless Special Counsel requests a hearing within ten (10) days after this Memorandum is issued for the purpose of showing that the proceeds are not traceable under the *Connecticut General Life Insurance Company v. Universal Insurance Company*, test, the Court will find for BNE in the sum of $56,923 plus interest earned from February 26, 1987, the date the funds were turned over under the stipulation.