Spina, J.
This matter was tried on several common law (jury waived) and nonjury counts. The defendant withdrew his counterclaim during trial. After trial, I find the following facts.
The plaintiff is an independent insurance agent, having been licensed since April 1, 1984. She has at all times material hereto lived and sold insurance in the Great Barrington, Massachusetts area. She began her insurance career with a husband and wife (Halls) agency in Berkshire County selling life insurance exclusively for Franklin Life Insurance Company (Franklin). Within a few years the plaintiff developed a clientele of over 200 people.
In 1988 the defendant approached the Halls, who he had known through Franklin, and asked them to work through his agency. He had become a general agent for Mutual Trust Insurance Company (Mutual Trust) on February 1, 1988, and his enthusiasm for that company, as well as that company’s product, had attracted the Halls.
*469 Mutual Trust is a small life insurance company whose home office is in Illinois. It engages approximately 150 general agents throughout the country, who in turn contract with approximately 500 agents. It enjoys an “A” rating from A.M. Best, a national service that rates firms based on financial stability. Mutual Trust is one of thirteen insurance companies whose dividends recently exceeded projections. Although plaintiff doggedly pursues a finding that Mutual Trust has the best life insurance policy on the market, neither this Court nor the representatives of Mutual Trust who testified are willing, or so foolish, to so conclude. Mutual Trust does offer what is regarded as highly competitive whole life and universal life insurance products.
The Halls were eager to have the plaintiff join them, but they warned the defendant that she was bossy, a cut-throat, and had other personal problems that are not material to this controversy. They were easily able to persuade the defendant to see beyond her flaws and engage the plaintiff for her virtues: the ability to make him money. Moved by the image of a union that afforded such promise, the defendant visited the plaintiff in her hospital room, where he wooed her with flowers. Having put his best foot forward, the defendant next arranged a meeting with the plaintiff in West Springfield which included the Halls, to seal the relationship with a written contract. During that meeting the plaintiff showed the defendant a list of her clients.
A contract between the parties was executed on April 18, 1988. The contract provided, inter alia, the plaintiffs negotiated commission rate, that the contract could be terminated by either pariy on written notice to the other, and an integration clause that included a clause that the contract would be “subject to the rules and regulations of [Mutual Trust] as issued from time to time.” The contract was a form agreement prepared by Mutual Trust, wherein defendant was the general agent and plaintiff was the broker (hereafter, agent). Mutual Trust was not a “captive” company: The plaintiff could write insurance for other companies, would maintain her own office and clients, set her own hours and take vacations as she alone determined.
The relationship indeed proved fruitful, at first. The plaintiff had the fourth highest level of sales nationally for Mutual Trust in 1989 and the ninth highest level of sales in 1990. She was by all accounts a very good life insurance salesperson. The defendant’s contract with Mutual Life provided that his general agency would receive commissions on first year life insurance policy premiums on a descending scale. Beginning in 1988 his agency would receive commissions of 115%, and those rates would decline 5% each year until a 95% commission rate was reached. The plaintiffs contract with the defendant, together with subsequent amendments, provided that she would receive 52.5% of his commissions. There was no disclosure as to his rate of commission. The plaintiffs share of the defendant’s commissions was increased to 65% as of October 1, 1988, then to 70% by May 30, 1990. These step increases were based on predetermined percentage levels of compensation by Mutual Trust. Whether a particular agent progresses to a higher step/level of compensation is a subject of negotiation between the general agent and the agent. The plaintiff was also entitled to receive between 5% to 10% of renewal premiums for the second through tenth years on policies she wrote.
The relationship was not without its difficulties. The plaintiff was not pleased by the defendant’s failure to provide her with all informational and educational bulletins issued by Mutual Trust. He sent her a total of 50 such bulletins. Others were available at his office in Springfield if she chose to drive from Great Barring-ton. She obtained over 400 other bulletins from another general agent. She frequently complained to the defendant about this, as well as his failure to provide ongoing training and educational service, as had been promised. These were the subjects (especially the defendant's failure to provide bulletins) of heated arguments between them, often marked by yelling and screaming. The defendant’s agency was typically one of the top 5 or 10 producers for Mutual Trust, but his management style, described as “laissez-faire,” was not especially complimentary to the plaintiffs needs. His agency grew from 5 to approximately 30 agents between 1988 and 1991.
There was a problem that arose from the location of plaintiffs office 50 miles from the defendant’s agency. All applications for life insurance prepared by a Mutual Trust agent must be submitted to the home office over the approval of the general agent. An exception was made in the case of the plaintiff due to the delays caused by having to send all paperwork to Springfield which were then compounded by the delays caused by a reverse flow of paperwork. Similar delays in commission payments were similarly resolved. Otherwise, the defendant had always approved plaintiffs applications as appropriate to her clients’ needs and finances.
The plaintiffs disillusion with the defendant’s ability to be a resourceful general agent festered, and that became a breeding ground for her growing resentment and a belief that the defendant was profiting handsomely from her efforts. The plaintiffs monthly overhead was $1,500 and she began consulting other general agents about her “problems." She learned that other agents were earning higher rates of commission than she. They began having arguments over compensation that became increasingly intense, to the point where third parties were being drawn in. The plaintiff sought the intervention of Horace Polglaze, a vice-president and regional supervisor of Mutual Trust, in early 1991, but defendant’s reaction was that they were trying to “steal his agency.” On March 26, 1991 *470 the defendant offered to increase her compensation to 75% of his commissions on her sales but she never accepted the offer and instead proposed a counter offer on or about May 7, 1991. Another senior agent in defendant’s general agency, James Scully, offered to provide plaintiff with the services she desired, and defendant agreed. Scully had a financial stake in the general agency’s overall productivity, and appreciated the financial impact the agency would sustain if plaintiff left. He was able to get along with the plaintiff, who by then, May 1991, could not get along at all with the defendant, and to whom she was openly hostile. She subjected him to ethnic slurs. A meeting was held on May 14, 1991 between the plaintiff, Scully and the defendant. These problematic issues were all aired, and the participants agreed to try to improve the relationship. On May 14, 1991 the defendant offered plaintiff yet a higher level of compensation based on amounts produced over $31,000 and $40,000. She never accepted that offer.
Over the Memorial Day weekend, 1991 the plaintiff learned about a “release” policy of Mutual Trust from another general agent. That policy arises out of Mutual Trust’s view that its customer is the general agent, and the insured is the customer of the agent selling the policy. There are myriad variations on the concept of a release policy in the industry, but Mutual Trust’s policy is unusually strong in favor of the general agent. That policy provides that if an agent is terminated, for whatever (non illegitimate) reason, no access to the Mutual Trust home office thereafter will be granted such agent under any circumstances, for the life of the agent, unless the general agent in its sole discretion releases the agent. That policy is not to be found in any bulletin, or policy and procedures manual, or contract issued by Mutual Trust. That policy exists nowhere in writing. Its purpose is apparently to prevent chaos among general agents: to prevent general agents from raiding other general agents of productive agents.
The defendant never disclosed the “release policy” to the plaintiff, because, as he said, it is a “negative,” and “why talk about divorce; we were discussing a marriage.” He had no legitimate business reason for not disclosing the policy. Had the defendant disclosed the release policy to the plaintiff before they executed their contract, she might not have entered into that contract or into a relationship with the defendant.
The relationship between the parties further deteriorated, primarily over issues of compensation. On August 19, 1991 the defendant telephoned the plaintiff to discuss their future together and his offer of May 14. She said she couldn’t go on. An argument ensued. The plaintiff asked to be released; the defendant said he would never release her. The next day the plaintiff received a letter from the defendant terminating their contract (without cause).
Following her termination the plaintiff was permitted to continue servicing her clients (for the benefit of both parties) but could not write new policies. The defendant failed to notify the plaintiff of the renewal dates on her clients’ policies, as he had agreed to do. As a result, many of her clients’ policies lapsed or were renewed upon late payment of premium, and her “persistency rate” dropped from approximately 90% to approximately 60%. A persistency rate is a calculation based upon timely payment of premiums and affects the agent’s commissions on renewals. Late payments or lapses/cancellations will lower a persistency rate. High persistency rates result in added compensation by way of bonus after the agent has written policies for three years. The plaintiffs commissions on renewals plummeted.
The defendant’s decision not to release the plaintiff was reviewed by Mutual Trust, which reserves such right to determine whether such action was motivated by some illegal (e.g., discriminatory) purpose. The company upheld the defendant’s action. The company did ask the defendant to consider releasing the plaintiff for “humanitarian reasons.” He has declined to release her.
The plaintiff has lost approximately 7% of the clients she had on August 20, 1991 because the defendant refused to release her and/or because he refused to cooperate in forwarding renewal information to her. She was able, later, to obtain a list of renewal dates directly from Mutual Trust, but not in time to save lost clients or lapsed policies. Once an agent loses access to a product she loses the ability to address the needs of a client, and therefore loses credibility among clients. Agents, such as plaintiff, operating in small communities depend in large part on personally knowing their clientele and on referrals. The plaintiffs market consists largely of the local business community in the Great Barrington area, a small, closely knit clientele. It is difficult to persuade clients to change policies because Massachusetts requires that the current insurer be notified and the client be given comparable data. See 211 C.M.R. 34.06 in particular, and 211 C.M.R. 34.00 et seq., generally.
The plaintiff has been able to write some life insurance for another non-captive company, but between that company’s product being less competitive than Mutual Trust’s policies, as well as being of a type that pays a smaller commission, and the strong sales pitch the plaintiff made for Mutual Trust for over three years and having thus been identified with that company in her small geographic area, her ability to sell life insurance has diminished markedly. She has been able to make up some of that loss through sales of health insurance and other insurance products. The plaintiff has sustained a loss of income as a result of the defendant’s refusal to release her. I find that she has suffered a loss of income from commissions in the amount of $28,675. She has also lost income from *471 renewals in the amount of $41,015 due to defendant’s failure to notify her of the renewal dates on some of her clients’ policies. Additionally, she has lost her free health insurance coverage from Mutual Trust, something she had earned by virtue of her level of productivity and something she could have continued receiving had he released her. That measure of damages has a fair value of $167 per month, or $5,845 from August 1991 through July 1994.
The plaintiff has claimed a loss in deferred compensation, but she is not entitled to any such loss. She is entitled to remove the amount she put into the program, but she is not entitled to receive any matching sums from Mutual Trust because her rights to such sums had not vested, and they would not vest until she had 10 years’ service with the company.
Mutual Trust does not grant its general agents exclusive rights to sell in a particular territory. The company does, however, have an understanding with the defendant that if he continues to perform, it will not put another general agent in western Massachusetts.
Additional findings are interposed in the Discussion section of this decision, which follows.
DISCUSSION
The plaintiff has advanced several theories of recovery in her complaint. Each count will be addressed separately.
The contract between the parties was their entire agreement, “subject to the rules and regulations of [Mutual Trust] as issued from time to time.” (Emphasis added.) The release policy involved here was never “issued” by Mutual Trust. It was never published anywhere. It was a policy that Mutual Trust never even disclosed to its general agents unless they asked about the terms of any release policy the company honored. Since it was never a rule or regulation “issued” by Mutual Trust, it was never incorporated by reference into the contract of the parties, and therefore was never a part of their contract. It was also a policy that the defendant never disclosed to the plaintiff, and something she never learned about until less than 90 days before she was terminated. There was never any novation or modification of the parties’ contract which included that policy.
A.Breach of Contract
The plaintiff contends that the exercise of the release policy by the defendant was a breach of contract. She fashions her argument from the assumption that she had the right to work for any other general agent of Mutual Trust upon termination of the contract, there being nothing in the contract to prevent her from doing so. Although that assumption was perhaps reasonable, it was not based upon anything in the contract language nor was it anything the parties had bargained for. The failure to release may indeed be actionable, but it is not a breach of contract. The mere fact that the defendant had the power to affect the life of the plaintiff by virtue of their once having had a contractual relationship does not render an exercise of that power a breach of contract based upon the absence of any reference in the contract to such power.
B.Breach of Duty of Good Faith and Fair Dealing
“The implied covenant of good faith and fair dealing provides ‘that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. . .’ ” (citation omitted). Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72 (1991). “[EJvery contract is subject to” that covenant. Id. at p. 473. The defendant had a duty to refrain from doing anything that would impair her ability to receive the “fruits” of her contact. Plaintiff does not contend the defendant wrongfully terminated her contact. The only “fruits” of the contract which remained identified with the contract after her termination on August 20, 1991 were the plaintiffs renewal premiums to be paid in years 2 through 10 on policies she had written. She lost approximately $ 14,000 in renewals after just one year as a proximate cause of the defendant’s failure to forward information regarding policy anniversary dates, something he should have done. The plaintiffs total damages caused by the defendant’s breach of his duty of good faith and fair dealing is in the area of loss of renewal commissions, and that sum is $41,015.
The defendant’s use of the release policy was beyond the scope and subject of the contract, so it is therefore not actionable under this theory.
C.Unconscionabilify
The plaintiff contends that the defendant’s use of the release policy was unconscionable. This cause of action applies to situations involving contract provisions or practices that are patently unfair. See Waters v. Min, Ltd., 412 Mass. 64 (1992); Zapatha v. Dairy Mart, Inc., 381 Mass. 284 (1980). Since the release policy was never a part of the contract, its use may not be the basis of an action for unconscionabilify.
D.Intentional Interference with Advantageous Relationship
The plaintiff seeks damages under a theory that the defendant was aware of her contemplated desire and ability to continue selling Mutual Trust life insurance and that he intentionally interfered with that opportunity by refusing to release her. To sustain a cause of action for interference with advantageous business relations the plaintiff must prove “(1) a business relationship or contemplated contract of economic benefit; (2) the defendant’s knowledge of such relationship; (3) the defendant’s intentional and malicious interference with it; (4) the plaintiffs loss of advantage directly resulting from the defendant’s contract.” Comey v. Hill, 387 Mass. 11, 20 (1982), quoting from Nolan, ‘Tort Law,” 37 Mass. Practice Series Sec. 72 (1979). “Malice" *472 has been further defined to mean an improper motive or the use of improper means. See United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990); Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703 (1992).
In the present case the plaintiff has met her burden of proof. She contemplated working for another general agent selling Mutual Trust insurance products. Dennis Tiunsky was willing to be her general agent. The defendant suspected that another general agent had been trying to steal her, and Mr. Polglaze of Mutual Trust’s home office had expressly asked him to consider releasing the plaintiff for humanitarian reasons. The sole purpose of not releasing the plaintiff was to prevent her from working for another general agent. It did not matter that the defendant may not have known the precise identity of the general agent. The defendant acted out of revenge and spite. He did not want the plaintiff to succeed with another general agent; he desired to punish her; he wanted to save face at and within Mutual Trust; and he didn’t want her to seem as though she was able to “rub his nose in it.” The plaintiff has lost an advantage directly resulting from his exercise of a release policy which had never been previously disclosed to her and which was not a part of their contract. Her damages are the commissions she proved she probably lost, $28,675, and her lost health insurance, valued at $5,485 since August 1991, plus her lost renewal commissions, $41,015, occasioned by the defendant’s failure (deliberate) to advise plaintiff of her clients’ respective policy renewal dates. Her total damages are $75,535. See Owen v. Williams, 322 Mass. 356 (1948).
E. Chapter 93A
The plaintiffs principal cause of action is brought under G.L.c. 93A, Sec. 11, alleging the defendant’s refusal to release her is an unfair method of competition, or an unfair or deceptive trade practice between people engaged in trade or commerce.
The threshold question presented is whether the plaintiff was herself engaged in trade or commerce, or whether she was an employee of the defendant. If the former, the analysis under Ch. 93A may continue; if the latter, she would not be entitled to recover under Ch. 93A. See Manning v. Zuckerman, 388 Mass. 8, 14 (1983).
The plaintiff was an independent contractor. She set her own hours of work, including vacation. She conducted her business as she determined. She was paid exclusively by commission and not on an hourly basis. She maintained her own business office, at her sole expense. She dealt with whoever she alone determined: She developed her own clientele. She was not supervised by anyone in her work. She rendered her services directly to the public by selling insurance products, and the defendant (and the Mutual Trust home office) only reserved the power and right to deny her applications and the policies she sought for her clients on the basis of appropriateness of product, the client’s ability to pay the premiums, and of course the client’s health or fraud in the client’s application. None of the applications she wrote was ever rejected or denied. Due to logistical problems, in short time the plaintiffs applications were sent directly to Mutual Trust. The plaintiff was a licensed Massachusetts insurance agent, and was lawfully empowered to write insurance independent of the defendant. Contrast Benoit v. Landry, Lyons and Whyte, 31 Mass.App.Ct. 948 (1991). She did not render any services to the defendant. The plaintiff was very much akin to a retailer, and the defendant to a distributor. The public was the plaintiffs client; the defendant was Mutual Trust’s client. For the foregoing reasons, I find that the plaintiff was herself involved in trade or commerce with the public, and that the plaintiff and defendant were involved in trade or commerce between themselves. The insurance industry itself employs practices that constitute trade or commerce for purposes of Ch. 93A. Dodd v. Commercial Union Ins. Co., 373 Mass. 72, 79 n.6 (1977).
In addition, since the dispute arises out of events which both preceded and occurred after the existence of the contractual relationship, rather than arising out of the contract itself, the employer-employee line of cases does not preclude relief under Ch. 93A. See Weeks v. Harbor National Bank, 388 Mass. 141, 144 (1983); Mitchelson v. Aviation Simulation Technology, 582 F.Supp. 1 (D.C. Mass., 1983).
The gravamen of the defendant’s conduct is that he knowingly and intentionally withheld information of the existence of the release policy from the plaintiff, then, post termination, exercised that policy while motivated purely by an intent to punish and harm the plaintiff. There are two distinct violations of Ch. 93A. The first is the failure to disclose a fact (the existence of the release policy) which “may have influenced [the plaintiff] not to enter into the [contract].” 940 C.M.R. Sec. 3.16(2); V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411 (1985, 1st Cir.). The second is the defendant’s ill-motivated use of the undisclosed release policy to purposefully harm and punish the plaintiff. The latter is conduct which “(1)... is within at least the penumbra of some common-law [intentional interference with advantageous business relations, and violation of the common law principles involving the permissible scope of negative covenants] ... or other established concept of unfairness; (2) . . . is immoral, unethical, oppressive, or unscrupulous; (3) . . . causes substantial injury to consumers (or competitors or other businessmen).” PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). The latter, post termination, conduct also rises to the level of “rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce,” the level of proof required for a violation of Ch. 93A, Sec. 11. Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498 504 (1979). Mr. Horace Polglaze, a seasoned insurance *473 man and the defendant’s regional supervisor, tactfully suggested in October 1991 that the defendant release the plaintiff “for humanitarian reasons,” but his ploy fell on deaf ears. Polglaze also testified, and I find, that there was no legitimate business reason for nondisclosure of the release policy prior to executing the contract. The defendant knew he was holding a trump card, but purposefully withheld his hand when he had a duty to disclose it. The failure to disclose also offends the PMP-Levings test, supra.
The plaintiff invested her career and her client base in her contractual relationship with the defendant. His pre-contract review of her client list, her asset, was significant to him before he would execute their contract. As a direct result of the defendant’s use of the undisclosed non-release power he had, something which was never even included in the fully integrated contract, the plaintiff has sustained serious and significant financial damage, as well as damage to her ability to earn money. She had totally committed herself to the Mutual Trust product in the eyes of her clients. Her inability to continue to sell its products through another general agent undermined her credibility. “Good will is of great importance in the insurance brokerage business. Customers have repeated and multiple insurance needs. Prompt service, integrity and loyalty are of some importance to customers who would tend to rely on key personnel who have demonstrated those qualities in the past.” Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 497 (1986).
I find the defendant has violated the provisions of G.L.c. 93A, Sec. 11, and as a result of said violation the plaintiff has sustained damages in the amount of $75,535, as described hereinabove under the section on Intentional Interference with an Advantageous Business Relationship.
I find the defendant’s violation of G.L.c. 93A, Sec. 11 to be a willful or knowing violation. I find that the defendant acted intentionally and with a conscious objective to do the acts in question, with the intention of punishing and causing financial harm to the plaintiff, with knowledge that his actions were unfair or deceptive. See Gilleran, The Law of Chapter 93A, §11.8, p. 363 (1989). Because his intentions were motivated by a base desire to punish and cause harm through the use of a power whose existence he had kept secret, I find that the plaintiff is entitled to triple damages, or $226,605. The plaintiff is entitled to costs plus interest on $75,535. Makino USA, Inc. v. Metlife Capital Corp., 25 Mass.App.Ct. 302, 320-21 (1988). She is also entitled to a reasonable attorneys fee, to be determined at a later hearing.
Passing mention has been made of negative covenants. The defendant has effectively attempted to rewrite his contract with the plaintiff so as to include a provision that prevents her from even selling Mutual Life products at any location. He has effectively succeeded in doing so, without regard to time or space limitations. The traditional analysis of the enforceability of a covenant not to compete is set forth in Alexander & Alexander, Inc. v. Danahy, supra, at p. 498. However, there was never any written or oral agreement not to compete in this case. Since there is no issue of trade secrets, this Court will not honor the Mutual Trust policy on release in this case. See Reece, “Employee Non-Competition Agreements and Related Restrictive Covenants: A Review and Analysis of Massachusetts Law,” 76 Mass. Law Rev. 2, 6 n. 63 (1991). There is no legitimate reason for the defendant to continue his exercise of the non-release power. He offered absolutely no evidence in support of its continued effect, much less his need for its original use. There was no evidence that defendant would be harmed in any way by plaintiffs continued writing for Mutual Trust in or at any location. His supervisor, Horace Polglaze, saw no use for it in this case, having urged the plaintiffs release “for humanitarian reasons.” Its continued use is disfavored, it is “unduly harsh [and] oppressive [to the plaintiff] . . . [and] injurious to the public.” Kroeger v. Stop & Shop Companies, Inc., 13 Mass.App.Ct. 310, 313 (1982). The plaintiff is suffering irreparable harm to her reputation and ability to earn a living as a result of its continued effect. The monetary damages awarded herein do not apply to prospective sales as of the date hereof. For these reasons, the defendant is hereby permanently enjoined from failing to release the plaintiff to sell Mutual Trust products.
For the reasons set forth herein, judgment is to enter for the plaintiff on Count I of her complaint in the amount of $75,535 plus interest thereon and costs. She is also entitled to multiple damages of $141,070 (without interest) to be added to said $75,535. The plaintiff is also entitled to attorneys fees to be determined at a later hearing.
The defendant is also hereby permanently enjoined from failing to release the plaintiff to sell Mutual Trust products at any location.