van Gestel, J.
This matter is before the Court, following a jury trial that concluded on February 11, 1999, on those issues that relate to the count seeking relief by the plaintiff[1] pursuant to G.L.c. 93A and on an application by the defendant seeking relief on an equitable subrogation defense. The Court took both issues for determination and does not here rely upon the jury’s verdict or its answers to special questions.
FINDINGS OF FACT
This case involves the relationship between members of the Politis family of West Roxbury and the Mercantile Bank and Trust Company (“Mercantile Bank”) of Boston. Asterios Politis (“Asterios”), patriarch of the Politis family, was an owner, developer and manager of real property, much of it located in the Roxbuiy district of Boston. Asterios was also a founder, along with a number of Greek-American businessmen, of Mercantile Bank. The bank, although not exclusively so, tended to serve the banking needs of the local Greek community.
Toula Politis (‘Toula”) was one of Asterios’s two daughters. Asterios, Toula, Toula’s sister, Villa Cabrera, and Asterios’s wife, Pandora, were generally involved in the various Politis family holdings. They served as general and limited partners in partnerships that acquired, owned and managed real properties. Much of the family banking was done with Mercantile Bank.
Asterios was the general partner of a limited partnership[2] that owned and managed an apartment building located at 1458-60 Tremont Street (the “Tremont Street property”). Toula, Pandora and Toula’s sister were the limited partners. In 1989, Mercantile Bank held a first mortgage in the amount of $850,000 on the Tremont Street property.
Toula conceived of the idea of utilizing the basement of the Tremont Street property for a laundromat business. Asterios accepted the idea, and on April 13, 1990, Mercantile Bank lent $200,000 to Toula for her venture.[3] Shortly thereafter, on September 10, 1990, Toula caused Soap and T., Inc. (“Soap and T”) to be incorporated. Much of the construction work to renovate the laundromat space was completed before Soap and T came into existence. Also, Soap and T, through an equipment financing agreement with Garment Machinery Company, Inc., an unrelated entity, for $116,660, acquired the laundry equipment, including washers, dryers, a soap-dispensing machine, a money-changing machine and a water heater.
Soap and T entered into a long-term lease with the Politis family limited partnership.[4] The lease was for fifteen years, with a five-year extension option. The rental payments were to be $500 per month. The laundromat opened for business early in 1991.
Toula considered her future options for the laundromat business to be one of three: (1) operate the business herself; (2) sublease the business to others; or (3) sell the business. She chose the second option and on March 1, 1992, entered into a sublease with Elton M. Grice and Timmy S. Brooks, two unrelated men. The sublease was for an essentially equivalent period of time to that of the initial term of the lease between Soap and T and the Politis family limited partnership and had a rental schedule calling for payments of $700 per month, with a CPI rent base adjustment of no less than 6% for each successive year.
Toula also had a separate agreement with her sublessees whereby they would make the payments on the equipment financing agreement for the washers, dryers, coin equipment and soap dispenser.
Earlier, in the fall of 1990, Asterios was having financial problems and approached Mercantile Bank for a refinancing of the Tremont Street properly from $850,000 to $1,200,000. He was, at that time, in default on his first mortgage with the bank. Mercantile Bank agreed to the refinancing and issued a commitment letter to Asterios. Among other things, the com *13 mitment letter called for Mercantile Bank to receive a new first mortgage in the amount of $1,200,000 to replace the extant $850,000 first mortgage.
The closing on Asterios’s refinancing was scheduled for October 18, 1990, at the office of Mercantile Bank’s attorney. Early on that morning, before heading in to Boston for the refinancing closing, Asterios, his wife Pandora and Toula went to a branch office of the National Bank of Greece in West Roxbury. There they had executed, before one of that bank’s notaries, a notice of lease for the fifteen-year lease between the limited partnership of the Tremont Street property and Soap and T.[5] Thereupon, Toula went directly to the Suffolk County Registry of Deeds and recorded the notice of lease at 10:07 a.m.
It does not appear that Toula was present at the closing of Asterios’s refinancing that took place a short time after her recording of the notice of lease. In any event, no one at the closing told Mercantile Bank’s attorney about the notice of lease or its recording. Thereafter, at 12:29 p.m., the bank’s attorney went to the Suffolk Registry and recorded the papers from the refinancing. In doing his final rundown, the bank’s attorney missed the notice of lease recorded a little over two hours earlier. Mercantile Bank’s new $1,200,000 mortgage, intended to be first, was thus second behind the notice of lease in the chain of title.
All was quiet for the next two years. The sublease, however, lasted only until the end of 1992. The subtenants had a falling out with each other; they gave up the business and stopped making any payments of rent or on the equipment financing agreement.
In early 1993, there were troubles at Mercantile Bank. A group of shareholders, apparently led by Toula, challenged the bank’s management and threatened a stockholder vote on ousting some of the bank’s officers. Also, Toula herself became a candidate for membership on the bank’s board of directors. Feelings were strong on both sides of the stockholder/management issues.
Meanwhile, the laundromat was closed for lack of a tenant. Toula, however, was attempting to market the property through local real estate brokers and advertisements that she placed in local papers. There were even some active negotiations between Toula and possible new tenants.
On April 7, 1993, George Demeter, Chairman of Mercantile Capital Corp., Mercantile Bank’s holding company — and one of the bank’s principals challenged by Toula Politis — called a meeting of shareholders at a hotel in Cambridge. At that meeting, Demeter urged the shareholders to support the then-extant management and to reject the importunities of Toula’s resurgent stockholder group. This meeting was held early in the evening.
Earlier in the day, on April 7, 1993, Mercantile Bank exercised its rights under Asterios’s defaulted mortgage and made entry on the Tremont Street property as start of the foreclosure process. In its entry, the bank changed all of the locks on all of the apartments in the building and changed the locks of the closed laundromat. All tenants, except for Soap and T, were given new keys to their apartments and told to make their rental payments thereafter to the bank.
Toula Politis, upon learning of the bank’s entry and change in locks, requested keys to the new locks on the laundromat. She was rebuffed by Stephen Ledoulis, a senior vice-president of Mercantile Bank. When she argued that Soap and T was a separate entity, she was told by Ledoulis, “It’s all in the family” and advised that she would be arrested if she came on the property. Toula was never again permitted to have access to the laundromat.
As was the case at the time of Asterios’s refinancing in October 1990, counsel for Mercantile Bank at the time of entry for the foreclosure in April 1993 seem to have missed the recording of the notice of lease between Soap and T and the limited partnership.
During its short time of operation, the laundromat does not appear to have been a roaring economic success. Although the records are sketchy, it appears that the operation was a loss for at least its first two years.
Both the lease between Soap and T and the limited partnership, and the lease between Soap and T and its subtenants, were at fair market rates. Further, there was good reason to expect that a new subtenant would have been found promptly if Toula had been permitted access to the property. A qualified economist calculated the present value, on February 11, 1999, of the leasehold for the laundromat to be $114,203. This calculation was predicated upon the rental payments called for in the two leases[6] — which a real estate expert opined were fair and reasonable — but did not include the payments to the equipment financing company.
RULINGS OF LAW Plaintiffs G.L. Chapter 93A Claim
On all matters here in issue, both Soap and T and Mercantile Bank were engaged in trade and commerce as contemplated by G.L.c. 93A, Sec. 11. See, e.g., Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 22-23 (1997).
G.L.c. 93A is designed to instill a general duty of good faith and fair dealing in business transactions. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 299 (1980). “(CJonduct ‘in disregard of known contractual agreements’ and intended to secure benefits for the breaching party constitutes an unfair act or practice for c. 93A purposes.” Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 474 (1991). The statute “was designed ‘to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices.’ ’’ Linkage Corporation v. Trustees of Boston University, supra, *14 425 Mass. at 25. “A practice is unfair if it is ‘within ... the penumbra of some common-law, statutory, or other established concept of unfairness .... is immoral, unethical, oppressive, or unscrupulous, [and] . . . causes substantial injury to [other businessmen].’ ” Id. at 27.
“A determination that conduct is unfair or deceptive is not dependent on traditional tort or contract theories and represents a finding under a statute that creates new substantive rights.” Id.; Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 626 (1978).
Here Mercantile Bank, negligently or otherwise, twice overlooked a duly recorded notice of lease between Soap and T and the limited partnership that owned the Tremont Street property: first, when its attorney recorded the new “first” mortgage for $1,200,000 in October of 1990; and second, when its attorneys commenced the foreclosure proceedings by entry in April of 1993. Merely changing the locks to the leased premises, by itself, could amount to an improper termination of the lease. Clapp v. Haynes, 11 Mass.App.Ct. 895, 896 (1980). Clumsy as all those actions may have been, however, they would not have resulted in significant harm to Soap and T had the bank acted in some manner other than it did when Toula Politis asked for keys to the new locks on the laundromat. The refusal thereafter to accede to Toula’s request, with the legally insufficient rebuff that “it’s all in the family” and the threat of arrest if she came on the premises, was without question heavy-handed, unfair, oppressive and, given the background relationship between the Politis family and the bank, unscrupulous.
There was no legally justifiable basis for Mercantile Bank to treat Soap and T in a manner different from that of any other valid tenant at the Tremont Street property after the bank’s entry and changing of the locks. The bank presented no evidence in this case sufficient to show that the lease between the limited partnership and Soap and T was invalid[7] or that the leasehold premises had been abandoned by Soap and T in April of 1993.
Setting aside, for the moment, issues relating to the recording of the notice of lease on the day of Asterios’s refinancing in 1990, Mercantile Bank never even treated Soap and T as an ordinary tenant of the Tremont Street property. Unlike all of the other tenants, Soap and T was not given access to the premises for reasons that to this day remain without satisfactory explanation.[8] The bank seeks to excuse its actions by pointing to its belief that there really was no separate lease with Soap and T. It was, the bank said, “all in the family.” Mercantile Bank is, however, bound by the public record here, the notice of lease — which at least should have suggested to it or its agents, its lawyers — that there was something out there that someone considered a genuine long-term lease that needed investigation.
From the point in time after Mercantile Bank made entry at the Tremont Street property on April 7, 1993, and immediately thereafter locked Soap and T out of its leasehold premises, at least after Soap and T’s claim to separate status and leasehold rights were made known to it, the bank, by doing nothing, was in violation of G.L.c. 93A. And from that time forward it is hard to see how that violation was other than willful and knowing.
Soap and T was damaged by Mercantile Bank’s actions. The measure of those damages is the value of what Soap and T lost — the fair market value of the unexpired leasehold of the laundromat, less the rental price set forth in the lease with the Politis family limited partnership, or Mercantile Bank as its successor. Gromelski v. Bruno, 336 Mass. 678, 681 (1958). It is not the lost profits from running the laundromat business, for they are, at its infant stage of development, far too speculative to calculate. The fair market value of the leasehold, however, was adequately supported by expert testimony. A knowledgeable real estate broker opined that the comparison of the lease between Soap and T and the Politis family limited partnership and that between Soap and T and its subtenants — each of which he found fair and reasonable — was an appropriate way to determine the leasehold value to Soap and T. A fully qualified economist performed the necessary arithmetical calculations to determine the present value, setting the figure at $114,203. As noted earlier, however, see n.6, this figure included the assumption that Soap and T would exercise the five-year option and extend its lease from September 9, 2005 to September 9, 2010.
This Court, in the absence of any supporting evidence, does not believe that the option period should be included in the fair market value calculation. It would only apply to the Soap and T lease, not the sublease to Grice and Brooks. Without the option period, the present value of the lost lease appears to be $67,695.
Given the willful and knowing violation of c. 93A, this Court doubles the damages to Soap and T from $67,695 to $135,390, as of the date of this decision. The plaintiff is also entitled to reasonable attorneys fees and costs, all to be determined and added to the judgment. Golber v. BayBank Valley Trust Company, 46 Mass.App.Ct. 256, 261 (1999).
Defendant’s Equitable Subrogation Claim
Mercantile Bank has asserted a defense based upon the concept of equitable subrogation. The bank argues that in October of 1990 it refinanced an $850,000 first mortgage on the Tremont Street property in return for a new $ 1,200,000 first mortgage on the same property. It claims, therefore, that the notice of lease between the obligor on the $850,000 first mortgage and Soap and T should be equitably subrogated to the new $1,200,000 first mortgage recorded a little over two hours after the recording of the notice of lease.
*15 The Supreme Judicial Court has recently canvassed the law regarding equitable subrogation. See, East Boston Savings Bank v. Ogan, 428 Mass. 327 (1998). “Equitable subrogation is an exception to the basic principle that determines priority among mortgages, ‘first in time is first in right.’ ” Id. at 329.
Where equitable subrogation applies: “One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.” ... In other words, the new mortgage given by the mortgagor, who used the proceeds of the new mortgage to extinguish an earlier mortgage, may receive the same priority once given to the earlier mortgage.
Id. at 329-30.
“A court applying equitable subrogation must ensure that the intervening mortgagee is not unjustly enriched by succeeding to first priority, but it also must ensure that the intervening mortgagee does not receive a lower priority as a result of the subrogee’s mistake.” Id. at 330. "The court must also examine the actions of the subrogee. The degree of knowledge attributable to a subrogee concerning the existence of the intervening mortgage may nullify equitable subro-gation.” Id. at 331.
Soap and T urges this Court to examine with care Mercantile Bank’s extensive knowledge of its existence as a tenant in the Tremont Street property, not the least of which includes the bank’s financing of the construction to make the premises ready. “Subrogee culpability, like their knowledge concerning intervening liens, is not susceptible to a clear rule that might distinguish acts that negate the use of subrogation from those that do not. The subrogee’s behavior is an important consideration that the court must balance in its equitable analysis of the interests of both mortgagees.” Id. at 331-32.
There is a Maine case, United Carolina Bank v. Beesley, 663 A.2d 574, 576 (Me. 1995), that found subrogation available to a mortgagee who — somewhat like the case here — negligently performed a title search. Of course, Mercantile Bank’s knowledge or lack thereof went well beyond the omission of its closing attorney when doing a rundown before recording the new mortgage to replace the old one.
Soap and T argues that the concept of equitable subrogation only applies to mortgages, and here we are dealing with a notice of lease. Given the SJC’s reluctance to apply bright-line rules, id. at 331, when dealing with subrogation, but rather to permit a trial court to apply principles of equity and fairness, this Court does not think, and therefore does not rule, that equitable subrogation does not apply here because we are dealing with a notice of lease, not a mortgage.
There is, however, a reason why equitable subrogation has no effect on this case. Such subrogation, if it exists, would stand between the intervening lienholder and the mortgagee — here Soap and T and the Mercantile Bank — at a time when legal proceedings were brought by the Mercantile Bank to terminate or otherwise affect the tenant’s leasehold rights. If the notice of lease is not subrogated, the tenant’s rights are greater than if it is. But even without a notice of lease, a tenant has certain rights against a foreclosing mortgage that cannot be trampled upon without following legal and due process. See, G.L.c. 184, Sec. 18; Attorney General v. Dime Savings Bank, 413 Mass. 284, 297-89 (1992).
“Possession of real estate under a lease given prior to the execution of a mortgage of the premises is not extinguished by a foreclosure. Gorin v. Stroum, 288 Mass. 6, 11 (1934)." FNMA v. Therrian, 42 Mass.App.Ct. 532, 524 n.3 (1997). See, also, HRPT Advisors, Inc. v. MacDonald, Levine, Jenkins & Co., P.C., 43 Mass.App.Ct. 613, 620 n.10 (1997). Soap and T’s lease was given prior to Mercantile Bank’s $1,200,000 mortgage.
Still further, the mortgage foreclosed upon contained a conditional assignment of leases. Thus, upon entry, the lease for the laundromat was not terminated: rather, Mercantile Bank became the assignee of the Soap and T lease and had the right to enforce it as the limited partnership’s successor. HRPT Advisors, Inc., supra, 43 Mass.App.Ct. at 619.
Here Mercantile Bank wholly ignored any rights of Soap and T by applying its own self-help eviction process when it changed the locks and refused new keys. In the utter absence of any post-entry legal action by the bank to terminate Soap and T’s lease, the debate about the equitable subrogation doctrine remains purely academic. Even with subrogation, the bank was still not free to act as it did.
ORDER
For the reasons set forth above, judgment shall enter in favor of Soap and T., Inc. in the amount of $135,390, together with reasonable attorneys fees and costs, with appropriate interest to run on said judgment.

 Although here described as “plaintiff’ and “defendant,” the parties are in actuality the “third-party plaintiff’ and the “third-party defendant” respectively.

 The full name of the limited partnership is “1458-1460 Tremont Street/715 Parker Street Realty Limited Partnership.”

 In actuality, $50,709.96 of the $200,000 was used to pay down an unrelated loan from Mercantile Bank to Toula. Only about $145,310.04 was used for the laundromat.

 Actually, the lease is dated September 3, 1990. The corporation, Soap and T, was not formed until September 10, 1990. There is little legal significance to this fact. See, Fra- *16 mingham Savings Bank v. Szabo, 617 F.2d 897, 899-900 (1st Cir. 1980).

 The notice of lease is dated “September 3rd, 1990,” although the signatures were not notarized until October 18, 1990.

 It is noted, however, that in making these calculations, the economist carried the leases from April 7, 1993 — the day of the lock-out — to September 9, 2010 — the final day of the lease expiration after the option to extend for five years in the Soap and T lease with the Politis family limited partnership. The term would have ended on September 9, 2005, if the option was not exercised. Further, no similar option appears in the sublease with Grice and Brooks.

 It should not pass unnoticed that a notice of the lease was publicly on record at the Suffolk County Registry of Deeds for two and one half years by the time of the foreclosure entry. Nor is there any contention that the sublease with Grice and Brooks was other than valid. That being the case, Soap and T must have had something to sublease, i.e., the right to possession that comes from the lease with the Politis family partnership.

 Whatever may have been the enmity created by Toula Politis’s leading of the charge by her rump group of shareholders against the bank’s management — the tactics of which seem questionable given her family's precarious financial position vis-a-vis the bank in the spring of 1993 — those actions do not provide legal coverage for the bank’s closing out of the laundromat property. Soap and T is not Toula Politis, even though it is controlled by her.