Cornetta, Roberta., J.
INTRODUCTION
The plaintiff, Citibank (South Dakota), N.A. (“Citibank”), filed the current action for account stated to recover a debt the defendant, Rosemary Walker DeCristoforo (“DeCristoforo”), purportedly owes it with respect to two delinquent credit card accounts. In response, DeCristoforo filed a counterclaim, alleging Citibank charged her interest in an amount greater than allowed by federal law. The matter is currently before the court on the parties’ cross motions for summary judgment. For the reasons explained below, DeCristoforo’s Motion for Partial Summary Judgment as to Liability on her Counterclaims will be ALLOWED in part and Citibank’s Cross Motion for Summary Judgment will be DENIED.
BACKGROUND
A. Factual Background
The material facts do not appear to be in dispute. Citibank is a national banking association located in South Dakota. DeCristoforo is an individual residing in Beverly, Massachusetts.
On October 1, 1984, DeCristoforo opened a credit card line of credit with Citibank, which has a current account number ending in 8960 (the “1984 Account”). Almost ten years later, on March 14, 1994, DeC-ristoforo opened a second credit card line of credit with Citibank, which has a current account number ending in 6865 (the “1994 Account”). DeCristoforo used the 1984 and 1994 Accounts to obtain credit from Citibank to acquire goods, services, and/or cash advances.
Citibank mailed periodic billing statements for the 1984 and the 1994 Accounts to the address DeC-ristoforo provided. The last payment posted to the 1994 Account on August 14, 2008 in the amount of $316.15. The last payment posted to the 1984Account on August 20, 2008 in the amount of $812.36. As of March 12, 2009, the outstanding balance on the 1994 Account, as reflected on its monthly statement, was $8,465.69. As of May 7,2009, the outstanding balance on the 1984 Account, as reflected on its monthly statement, was $25,870.44.
With respect to all unpaid amounts owed under the 1984 Account, as asserted in monthly statements to DeCristoforo, dated January 8, 2001 thru May 7, 2009, Citibank charged interest at annual rates of no less than 14.4% and no greater than 32.24%, exclusive of late fees and other charges. With respect to all unpaid amounts owed under the 1994 Account, as asserted in monthly statements to DeCristoforo, dated July 13/August 13,2001 thru February 12/March 12, 2009, Citibank charged interest at annual rates of no less than 10.65% and no greater than 54.7333%, exclusive of late fees and other charges.
B. The Consumer Credit Industry
Statistics show that DeCristoforo’s circumstances are not unique. Twenty years ago, in 1990, there were approximately 82 million credit cardholders.[1] By 2003, that number had increased to 144 million.[2] In addition to an increase in the number of cardholders, there has been a 350% increase in the amount that these cardholders charge while, during the same period, income has only risen by 188%.[3] These statistics lead to the inescapable conclusion that the general public is drowning in credit card debt. In fact, almost 50% of American families owe some amount of credit card debt.[4] Importantly, these statistics are not just *140 about “avid commercialism”—individuals are using credit cards for everyday necessities, such as food and utilities.[5] According to a report published in February 2008 by the Center for American Progress, in November 2007, total credit card debt in the United States had reached an all time high of $790.2 billion.[6] Sluggish economic recovery combined with the unregulated interest rates and hidden fees the credit card companies charge, however, make it impossible for consumers to get out from under these debts,[7] adversely impacting upon the ability of consumers to ever emerge from an endless interest and fees induced spiral.[8]
DISCUSSION
I. Standard of Review
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing parly’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991). The nonmoving party cannot, however, defeat the well-pled motion for summaiy judgment by resting on its pleadings; rather, it must respond by alleging specific facts demonstrating the existence of a genuine fact. Correllas v. Viveiros, 410 Mass. 314, 317 (1991). The court views the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
II. DeCristoforo’s Counterclaims
In support of summaiy judgment on her counterclaims, DeCristoforo argues 12 U.S.C. §85 (“Section 85”) caps interest at seven percent and that Citibank violated this provision by charging interest, on the 1984 Account, between 14.4% and 32.24%, and on the 1994 Account, between 10.65% and 54.7333%. In response, Citibank contends Section 85 is not applicable in this case because, in accordance with the Supreme Court’s holding in Daggs v. Pheonix Nat’l Bank, 177 U.S. 549 (1900), this provision only applies where the bank’s home state does not allow for any interest. Since Citibank is headquartered in South Dakota and South Dakota allows interest at any rate agreed upon in writing, according to Citibank, it can charge interest at any rate agreed upon between it and its credit card customers. This dispute highlights an issue of national concern—mounting credit card debt and unregulated interest rates, which make paying that debt next to impossible.
A. Section 85
To help finance the Civil War, in 1861, then Trea-suiy Secretary, Salmon P. Chase, recommended the federal government establish a national banking system whereby national banks could be chartered by the federal government and authorized to issue bank notes secured by government bonds.[9] This idea came to fruition a fewyears later, in 1864, when the National Banking Act was enacted.[10] Section 85 was included in the National Banking Act to protect against usurious interest rates.
Section 85 provides, in relevant part, that
[a]ny association may . . . charge on any loan . . . or upon . . . other evidences of debt, interest at the rate allowed by the laws of the State . . . where the bank is located . .. and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under title 62 of the Revised Statutes. When no rate is fixed by the laws of the State . . . the bank may . . . charge a rate not exceeding 7 per centum . . .
12 U.S.C. §85. No decisions interpreting this provision, pertinent to the resolution of the current dispute, were decided until 1900 when the Supreme Court decided Daggs.
In Daggs, a national bank located in Arizona sought to enforce promissoiy notes bearing a ten percent interest rate. Id. at 549. In response, Daggs argued Section 85 limited the interest rate to seven percent, if no rate was “fixed” by the laws of the state or territory where the national bank was located. Id. at 554. Because, in Arizona, the interest rate was not “fixed” by the laws of the territoiy, but by the parties to the notes, Daggs contended the notes were usurious. Id. The Supreme Court disagreed. Id. at 555.
The Supreme Court concluded that the phrase “fixed by the laws,” from the second sentence of Section 85, should be construed to mean “allowed by the laws.” Id. It reasoned that the “national banks ‘were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the general government. It could not have been intended, therefore, to expose them to the hazard of unfriendly legislation by the states, or to ruinous competition with state banks.’ ” Id. at 555, quoting Tiffany v. National Bank, 85 U.S. 409, 413 (1873). Under this interpretation, Section 85’s interest rate cap is only applicable when the laws of the bank’s home state allow no interest rate. See Hawkins v. Citicorp Credit Servs., Inc., 665 F.Sup.2d 518, 523 (2009) (emphasis added).
For all practical purposes, Daggs eliminated the protections affo'rded by Section 85. Following Daggs, the national banks were able to charge interest at whatever rate was allowed by the state in which they *141 were located and there was very little uniformity from state to state. Interest rates were lower in states concerned with consumer protection, but much higher in states trying to lure large commercial banks into doing business within their borders. This went on until 1978, when the Supreme Court decided Marquette v. First Omaha Serv. Corp., 439 U.S. 299 (1978).
Marquette involved two banks: Marquette National Bank of Minneapolis (“Marquette”), where the state’s usury law capped interest rates for loans at twelve percent; and the First National Bank of Omaha (“First National”) in Nebraska, where state laws allowed an interest rate of up to eighteen percent. Id. at 301-03. To make up for the low cap in Minnesota, banks in Minnesota could charge an annual fee, which Marquette did. Id. at 304-05. First National then started marketing its credit cards to Minnesota residents as “no-fee” cards. Id.
Perceiving itself to be at a disadvantage, Marquette sued First National, arguing it was violating Minnesota’s usury law. Id. The Supreme Court made two important rulings. First, it concluded that state usury laws do not apply to nationally chartered banks based in other states. See id. at 308. Second, it decided that nationally chartered banks can “export” the interest rates allowed in their home states to customers throughout the country. Id. at 313-14. Under this holding, when a bank from a state without limits on interest issues credit cards to people living in states, which cap credit card interest, the costumer can be charged any rate of interest. See id.
The Marquette decision caused unprecedented expansion in the consumer credit industry as large national banks relocated to states with lender-friendly interest rate provisions.[11] Today, all of the major credit card companies are located in a handful of states such as South Dakota, Utah, Arizona, and Delaware where the interest rate caps are either extremely high or nonexistent.[12] Citibank is no exception.
In 1980, during a time of great economic strife in South Dakota, Citibank executives approached the then governor, William Janklow, with a plan.[13] Citibank would move its headquarters to South Dakota, providing hundreds of high-paying white-collar jobs, if South Dakota quickly passed legislation eliminating its interest rate cap.[14] South Dakota responded by passing a new interest rate provision, which provides, in pertinent part, that
[u]nless a maximum interest rate or charge is specifically established elsewhere in the code, there is no maximum interest rate or charge, or usuiy rate restriction, between or among persons, corporations . . . associations, or any other entities if they establish the interest rate or charge by written agreement. A written agreement includes the contract created by §54-11-9.[15]
South Dakota Condified Laws §54-3-1. Thereafter, Citibank relocated from New York to South Dakota.[16] Ultimately, this arrangement succeeded beyond the parties’ expectations. Citibank’s agreement with South Dakota brought 3,000 high-paying jobs to the state and enabled Citibank to become a credit card giant, exporting South Dakota’s unregulated interest rate provision to customers around the country, including DeCristoroforo.[17] Merely because Citibank is able to charge interest premised on South Dakota law, which does not cap interest, does not, however, mean Citibank can charge any interest rate. Citibank’s interest rate must still comport with common-law concepts of fairness such as unconscionability.[18]
B. Unconscionability
“The doctrine of unconscionability has long been recognized by common law courts in this country and in England.” Waters v. Min Ltd., 412 Mass. 64, 66 (1992), and cases cited. As the Appeals Court aptly explained more than three decades ago:
Historically, a bargain was considered unconscionable if it was “such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.” Hume v. United States, 132 U.S. 406[, 411] (1889), quoting 38 Eng.Rep. 82, 100 (Ch. 1750). Later, a contract was determined unenforceable because unconscionable when “the sum total of its provisions drives too hard a bargain for a court of conscience to assist.” Campbell Soup Co. v. Wentz, 172 F.2d 80, 84 (3rd Cir. 1948).
Covich v. Chambers, 8 Mass.App.Ct. 740, 750 n.13 (1979).
Unconscionability is a matter of law decided by the court and must be determined on a case-by-case basis. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291 (1980). Particular attention is addressed to “whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party.” Waters, 412 Mass. at 68, quoting Zapatha, 381 Mass. at 292-93. “The principle is one of prevention of oppression . . . and not of disturbance of [the] allocation of risks because of superior bargaining power.” Zapatha, 381 Mass. at 292, quoting U.C.C. §2-302, cmt. 1. “Oppression” is a matter of the substantive unfairness of the contract; “unfair surprise” means procedural unfairness in the manner in which the contract was concluded. See Id. at 293-95.
Substantive unconscionability occurs when contract terms are unreasonably favorable to one party. See Gilman v. Chase-Manhattan Bank, N.A., 534 N.E.2d 824, 829 (N.Y. 1988) (stating the question of substantive unconscionability “entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom the unconscionability is urged . . .”). When “a provision of the contract is so outrageous as *142 to warrant holding it unenforceable,” unconscionability can be based on the substantive component alone. Id. Meanwhile, procedural unconscionability “requires an examination of the contract formation process and the alleged lack of meaningful choice.” Id. at 828.
Although the facts pertaining to the formation of DeCristorforo’s credit card agreements are not set forth in the record, the court can fully grasp the one-sided nature of those proceedings. Nevertheless, even putting procedural unconscionability aside, the court concludes this is an instance where unconscio-nability can be based on the substantive component alone. Id. at 829. The court acknowledges that Citibank’s interest rate charges are not always unreasonable. For example, at times, Citibank charged De-Cristoforo as little at 10.65%. As time went by, however, Citibank continually increased its rate, especially as DeCristoforo began to fall behind with her payments, until it reached rates as high as 54.7333%. Substantial interest rate hikes such as this have greatly contributed to the consumer credit crisis in America.
With interest rates as high as forty and fifty percent, a significant portion of the debtor’s monthly payment goes toward paying interest without touching the underlying debt. At these rates, individuals must make monthly payments for years before putting a dent in their debt, especially when one owes credit balances in excess of $25,000, as is the case with DeCristoforo. Interest charges at these rates drain needed resources and slow economic growth. Citibank’s charges, in excess of eighteen percent, “drives too hard a bargain for a court of conscience to assist.” Campbell Soup Co., 172 F.2d at 84. The court concludes interest rate charges above eighteen percent are unconscionable and “so outrageous as to warrant holding [them] . . . unenforceable.” Gilman, 534 N.E.2d at 829.
III. Citibank’s Claims
Citibank contends it is entitled to summary judgment on its account stated claims because it mailed monthly statements for both the 1984 and the 1994 Accounts to DeCristoforo, showing the transactions on those accounts, and she retained these statements without objecting to the charges. In response, DeC-ristoforo argues there is an issue of fact as to whether her failure to object to the accuracy of the statements constitutes an acknowledgment of their correctness. The court concludes summary judgment is inappropriate because there is no agreement between the parties as to what DeCristoforo owes Citibank.
“A stated account is an agreement between the parties entered into after an examination of the items by which a balance is struck in favor of one of them . . .” Davis v. Arnold, 267 Mass. 103, 110 (1929), quoting McMahon v. Brown, 219 Mass. 23, 27 (1914). A claim for account stated does not create liability where none existed previously; rather, it determines the amount of a debt where liability already exists." Id., citing Chase v. Chase, 119 Mass. 556 (1876). Under an account stated theory, a party’s receipt of account statements and the failure to timely object to the amounts reflected establishes the party’s liability for the account balance. See Milliken v. Warwick, 306 Mass. 192, 196-97 (1940) (stating assent “may be inferred from the reception and retaining of the account without objection”), quoting Union Bank v. Knapp, 3 Pick 96, 113 (1825); see also McMahon 219 Mass. at 27.
Here, it is undisputed that Citibank mailed, to DeCristoforo, monthly statements for the 1984 and the 1994 Accounts. Further, DeCristoforo does not appear to dispute that she made the purchases or accepted the cash advances listed on the account statements. At an initial glance this would seem to support summary judgment in Citibank’s favor. However, in her counterclaim, which is discussed above, DeCristoforo objects to the interest rate Citibank charged. Although DeCristoforo is clearly liable for the goods, services, and/or cash advances she incurred under each account, there is no agreement between the parties as to what DeCristoforo actually owes Citibank. Therefore, Citibank’s Cross Motion for Summary Judgment will be DENIED.
ORDER
For the reasons set forth above, it is hereby ORDERED that: (1) DeCristoforo’s Motion for Partial Summary Judgment is ALLOWED in relation to interest charged by Citibank; and (2) Citibank’s Cross Motion for Summary Judgment is DENIED. The parties are further ORDERED to appear before this court on February 10, 2011 at 2:00 p.m. for a status conference and an assessment of damages hearing.

 Susan Walker, U.S. Consumer Credit Card Debt May Crash Economy, Fox NEWS, Dec. 31, 2004, available at http://www.foxnews.com (last visited Dec. 17, 2010).

Id.

Id

Brian K. Bucks, Arthur B. Kennickell, Trace L. Mach, & Kevin B. Moore, Changes in U.S. Family Finances from 2004 to 2007: Evidence from the Survey of Consumer Finance, FEDERAL RESERVE BULLETIN, vol. 95, Feb. 2009, available at http://www.federalreserve.gov (last visited Dec. 17, 2010).

See Christian E. Weller, Warning: Credit Card Practices Can Be Detrimental to Your (and Their) Health, CREDIT SLIPS: A DISCUSSION ON CREDIT, FINANCE, AND BANKRUPTCY, Mar. 19, 2009, available at http://www.creditslips.org (last visited Dec. 17, 2010) (“[People] would have to plaster walls with plasma [televisions], have [a] different ipod for every day, and rent storage for [their] new wardrobe[s] to explain [the] debt families have taken on in recent years”).

Tim Westrich & Christian E. Weller, House of Cards: Consumers Turn to Credit Cards Amid the Mortgage Crisis, Delaying the Inevitable Defaults, CENTER FOR AMERICAN PROGRESS, Feb. 2008, available at http://www.amer-icanprogress.org (last visited Dec. 17, 2010).

See Christian E. Weller, Drowning in Debt: America's Middle Class Falls Deeper in Debt as Income Growth Slows and Costs Climb, CENTER FOR AMERICAN PROGRESS, May *143 2006, available at http://www.americanprogress.org (last visited Dec. 17, 2010).

See Weller, CREDIT SLIPS, available at http://www.credltsllps.org (last visited Dec. 17, 2010).

Office of the Comptroller of the Currency, History: The National Banking System, UNITED STATES DEPARTMENT OF THE TREASURY, available at http://www.occ.treas.gov (last visited Dec. 17, 2010).

Richard S. Grossman, US Banking History: Civil War to World War 11, ECONOMIC HISTORY ASSOCIATION, Jan. 2, 2010, available at http://www.eh.net (last visited Dec. 17, 2010).

Pat Cuny, How a Supreme Court Ruling Killed Off Usury Laws for Credit Card Rates: A 1978 Court Case Changed the Industry—and Put Cards in Everyone’s Pocket, Fox NEWS, Nov. 12,2010, available athttp://www.foxbusiness.com (last visited Dec. 17, 2010).

Frontline, Secret History of the Credit Card: Map: Snapshot of the Industry, FRONTLINE, JNov. 23, 2004, available at http://www.pbs.org/wgbh/pages/frontllne/shows/credlt /more/map.html (last visited Dec. 17, 2010).

Robin Stein, Secret History of the Credit Card: The Assendancy of the Credit Card Industry, FRONTLINE, Nov. 23, 2004, available at http: / /www.pbs.org/wgbh/pages/frontline /shows /credit /more/rise.html (last visited Dec. 17, 2010).

Id.

South Dakota Codified Laws §54-11-9 provides that “(t]he use of an accepted credit card or the Issuance of a credit card agreement. . . creates a binding contract between the card holder and the card issuer with reference to any accepted card, and any charges made with the authorization of the primary card holder.”

Stein, available at http://www.pbs.org/wgbhlpages/frontllne/shows/credlt /more/rise.html (last visited Dec. 17, 2010).

Id.

Below, the court addresses unconscionabiHty. As an initial matter, however, the court notes that Massachusetts law appHes to its unconscionabiHty analysis. In determining what law appHes, the court must use the conflict-of-law rules of the forum state, i.e., Massachusetts. See Clarendon Nat'l Ins. Co. v. Arbella Mut Ins. Co., 60 Mass.App.Ct. 492, 495 (2004). Massachusetts has adopted a functional choice-of-law approach to contract cases that “responds to the interests of the parties, the (s)tates involved, and the interstate system as a whole.” Bushkin Assoc., Inc. v. Raytheon Co., 393 Mass. 622, 631 (1985). “Under this approach, in the absence of a contractually binding choice of law clause or agreement, [the] court looks to the law of the state with the most significant relationship to the transaction and the parties.” Spence v. Kantrovitz, 392 F.Sup.2d 29, 35 (D.Mass. 2005) (footnote omitted); see also Restatement (Second) of Conflict of Laws, §6 (1971). In determining which state has the most significant relationship, the court examines “(a) the needs of the interstate and international systems, (b) the relevant poUcies of the forum, (c) the relevant poUcies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic poUcies underlying the particular field of law, (f) certainty, predictabflity and uniformity of result, and (g) ease in the determination and appUcation of the law to be appHed.” Bushkin, Assocs., Inc., 393 Mass. at 632, citing Restatement (Second) of Conflict of Laws, §6(2) (1971).
In this case, the parties have not provided the court with a contract identifying a choice of law provision. Thus, the court must use the factors set forth in the Restatement to determine whether South Dakota or Massachusetts has the most significant relationship to the transactions at issue. None of the above factors weigh in favor of applying South Dakota law. Citbank purposely chooses to market its credit card products to Massachusetts residents. DeCristoforo is a resident of Massachusetts. Any contract or agreement between Citibank and DeCristoforo would have been executed in Massachusetts. Most importantly, Massachusetts has a strong public policy interest in ensuring its residents are protected against predatory lending practices, which is more significant than any countervailing interest South Dakota may have in the current dispute.